[Civ. No. 63195. Second Dist., Div. Five. June 30, 1982.]

In re the Marriage of GALE and PAUL HALPERN.
GALE HALPERN, Respondent, v.
PAUL HALPERN, Appellant.

COUNSEL

James E. Sutherland for Appellant.

Marc J. Poster and Harvey Strassman for Respondent.

OPINION

LAVINE, J.*—The husband (hereinafter called Paul) appeals portions of an interlocutory judgment of dissolution of marriage adjudging that he is not the father of a minor child, Laurie, and that reasonable visitation is denied him. Pursuant to stipulation in court, the trial court had found that Paul is not the biological father of Laurie; and that since it is not in the best interests of Laurie that Paul shall visit her, he is denied visitation rights because Paul is a nonparent and that future conflicts may arise if he were granted visitation.

ISSUES

1. Whether the trial court has jurisdiction in a proceeding for dissolution of marriage to award visitation or custody to anyone concerning a child who is adjudged by the court not to be a child of the marriage.

2. Whether Paul is the de facto parent of Laurie: a. By reason of the factual relationship between Paul and Laurie. b. By reason of estoppel.

3. Whether the trial court erred in denying Paul visitation rights concerning Laurie.

4. Whether the trial court erred in denying a psychiatric examination of the mother and child.

*Assigned by the Chairperson of the Judicial Council.

FACTS

The parties married January 26, 1978, and Laurie was born June 13, 1978. The wife (hereinafter called Gale) filed her petition for dissolution of marriage on June 18, 1979, stating that Laurie was a child of the marriage and asking for child support and custody. Paul's response, filed July 11, 1979, admitted that Laurie was a child of the marriage and prayed for determination of support and custody rights, with custody to Gale.

On August 10, 1979, Gale filed an amended petition, again acknowledging that Laurie was a child of the marriage, but requested that Paul be denied visitation. On September 21, 1979, after Paul sought a visitation order, Gale filed a second amended petition, stating that there were no children of the marriage. Between the time of filing the amended petition and second amended petition by Gale, Paul filed an order to show cause seeking joint custody, with physical custody to Gale and reasonable visitation to Paul. The court awarded limited visitation to Paul.

Before trial the parties stipulated to HLA tissue tests, which established that Paul was not the biological father. Paul sought an order requiring Laurie and Gale to be examined by Paul's psychiatric witness to establish the elements of "psychological parenthood," to show that visitation was in Laurie's best interests, and to establish estoppel. At the hearing, it appearing that the HLA tissue tests had shown that Paul was not the father, the court denied the motion without prejudice. No appeal was taken from such a denial.

Gale discovered her pregnancy after she started living with Paul. She contended at first she did not know who the father was and thought it might be Paul. There was testimony that Gale knew prior to the marriage that Paul was not the father. They agreed to marry and to put Paul's name on the birth certificate, and that they would raise the child together. Some friends and relatives knew that Paul was not the biological father, but others were told he was. Gale followed the Lamaze child birth method with Paul as her coach. He was present in the delivery room, cutting the umbilical cord. About two months after the birth of Laurie, Gale returned to work as a critical care nurse, while Paul stayed at home seeking his career as a writer. He took care of Laurie during the daytime, while Gale worked to support the family.

Laurie called Paul "daddy" from the first time she could talk. Paul and Gale separated on June 15, 1979, when Laurie was eleven months old, and Paul visited Laurie about five or six times until the end of July. At that time Gale told Paul that the child was having difficulties, that the child had to know the truth of who was her natural father, and that she was denying Paul further visitation. Paul then obtained a visitation order on Saturdays from 10 a.m. to 4 p.m. with a monitor present. Gale testified that during these visits she was assaulted by Paul in the presence of the child, who broke her toe and grabbed Laurie from her, and that she had filed a civil assault and battery action. She stated she was presently residing with a medical doctor (who is not the natural father of Laurie), that they were waiting to get married, and that this doctor wants to adopt Laurie.

The only expert testimony came from a psychiatrist who testified that babies form connections with caring adults within the first couple of weeks of life; that they recognize their care providers by six to seven months; and although they do not have the intellectual capacity to articulate who is their father or mother by one year of age they recognize the parental role. He stated his opinion that Laurie had shown significant attachment to Paul, that severing such an attachment could be expected to cause immediate anxiety and depression, that the dislocation could be expected to have effects later in life even if Laurie had no distinct memory of Paul. He also stated that whether Paul is the biological father should make no difference to Laurie, and that it would be in her best interests to continue her relationship with Paul even if there were later conflicts over visitation, and a new "father" were introduced into her life.

The trial court stated that the mother had not misled Paul because they had mutually agreed to raise the child and Paul knew he was not the father. Under these circumstances the court did not find estoppel. As to visitation the court believed that Laurie was not old enough to recognize a father or to know what a father is. Because of Laurie's age, the court concluded that she would get over any disturbance very quickly if the assumed new stepfather took over. Because of Laurie being less than two years, the court did not believe the psychiatric testimony. The court foresaw visitation conflicts as inevitable in view of the many court battles witnessed over the years, stating: "I have to find the best interests of the child require there be no visitation because he is a nonparent. He absolutely has no relationship to the child bloodwise *or otherwise* and I can't accept I should burden all of the parties in this matter, in-

cluding Mr. Halpern, with conflicts, struggles and disruptions for years to come because of Mr. Halpern's present emotional state in connection with the child." (Italics added.)

Findings of fact were not requested. In its judgment the court found (a) pursuant to stipulation in open court, that Paul is not the biological father of Laurie; (b) that there is no estoppel of any kind to be imposed against Gale, and that there is no child custody or visitation by estoppel in favor of Paul; and (c) *that it is not in the best interest of Laurie to have Paul visit* her, and that Paul shall have no visitation of Laurie.

After trial, visitation was again denied by the court, and a petition for a writ of supersedeas was denied by this court. Orders were made restraining Gale from commencing adoption proceedings until further order of court, ordering Gale to advise Paul of any change of address of Laurie, and to make available to Paul the identity of Laurie's pediatrician and the schools she attends, permitting Paul to obtain status information concerning same.

## DISCUSSION

1. Whether the trial court has jurisdiction in a proceeding for dissolution of marriage to award visitation or custody to anyone concerning a child who is adjudged by the court not to be a child of the marriage.

Civil Code section 4351 provides in part: "In proceedings under *this part*, the superior court has jurisdiction to inquire into and render such judgments and make such orders as are appropriate concerning the status of the marriage, the *custody and support of minor children of the marriage*, . . . . . ." (Italics added.) The words "this part" refers to "Part 5. THE FAMILY LAW ACT" which embraces sections 4000-5174 of the Civil Code.

Section 4359, subdivision (a) provides in part: "During the pendency of any proceeding under Title 2 (commencing with Section 4400) [dealing with JUDICIAL DETERMINATION OF VOID OR VOIDABLE MARRIAGE] or Title 3 (commencing with Section 4500 [dealing with DISSOLUTION OF MARRIAGE] of this part, upon application of either party . . . the Superior Court may issue ex parte orders . . . (4) determining the temporary custody of any minor children of the marriage, and the right of a party

to visit the minor children upon the conditions as the court may determine...." It is upon the basis of this section 4359 that the trial court granted custody and visitation rights to the parties pendente lite.

Section 4601 states: "Reasonable visitation rights shall be awarded to a parent unless it is shown that such visitation would be detrimental to the best interests of the child. In the discretion of the court, reasonable visitation rights may be granted to any other person having an interest in the welfare of the child."

Respondent contends, for the first time on appeal, that the trial court did not possess subject matter jurisdiction under the facts of this case to decree in a dissolution proceeding that Paul had any right of custody or visitation concerning Laurie—because the legislative grant of authority extends only to conferring such rights with respect to the minor children of the marriage. Although the point was not raised in the court below, this court may consider the question, as subject matter jurisdiction cannot be conferred upon a court by consent, waiver or estoppel. (*In re Marriage of Ben-Yehoshua* (1980) 91 Cal.App.3d 259, 263 [154 Cal.Rptr. 80].)

Subsequent to the trial court's judgment, *Perry* v. *Superior Court* (1980) 108 Cal.App.3d 480 [166 Cal.Rptr. 583] held on this very question that the trial court had no jurisdiction to order visitation rights. The facts of *Perry* are that Frederick and Roxanna were married in 1973. About six years later Roxanna filed a petition for dissolution of the marriage. Roxanna is the mother of Lonnie whose natural father was her former husband, since deceased. Lonnie was born about nine months before Roxanna's marriage to Frederick, and was about seven at the time that Frederick sought visitation rights with Lonnie. The interlocutory and final decree of dissolution were silent as to the custody of or visitation with Lonnie. Frederick's and Roxanna's stipulation provided that there were no minor children of the marriage, and no contention has been made that Frederick has adopted Lonnie or was the natural father. Pursuant to an order to show cause, issued upon the petition of Frederick seeking visitation, the court order defined the visitation rights and ordered a probation study. The probation report was favorable to Frederick. Roxanna challenged the jurisdiction of the trial court to award visitation, which in denying the motion to dismiss had noted:

"'COURT ORDERS: Petitioner's Motion to Dismiss O.S.C. re: Visitation upon the ground that the Court lacks jurisdiction to entertain said cause is Denied.

"'MEMO: The issue presented seems to be one of first impression: Neither side has offered authority that is directly in point.

"'There is a prima facie showing that the respondent has filled the role of father in every respect most of the child's life. The fact that there is no "blood relationship" seems inconsequential, logically speaking, when viewing the ultimate issue which concerns the best interest of the child. Of course, the extent and frequency of said visitation or whether any order should be made depends upon the evidence presented at the hearing (including the Probation Officer's Report) and what is determined to be in the best interest of the minor.'" (*Perry* v. *Superior Court, supra*, 108 Cal.App.3d at pp. 482-483.)

The appellate court observed (p. 483) that visitation was a limited form of custody stating: "Preliminarily we note something that may be self-evident: visitation rights, while not equivalent to full custody [citation omitted], is a limited form of custody during the time the visitation rights are being exercised. Thus, Civil Code section 5151, subdivision (2), which is part of the Uniform Child Custody Jurisdiction Act ... recognizes that a 'custody determination' includes a court decision regarding visitation rights....

"It also must be recognized that a marital dissolution proceeding is only one of a number of proceedings in which custody and visitation rights can be litigated." The court recognized that California has at least eight separate proceedings in which custody questions can be litigated. (Fn. 4 on pp. 483-484 discusses these eight ways.)

The appellate court stated on page 484: "There can be no doubt that if the issue of custody or visitation is properly before the court in one of these proceedings the court has the authority to award custody or visitation to a nonparent pursuant to Civil Code sections 4600 and 4601. Moreover, the standards set forth in Civil Code section 4600 for determining who should receive custody govern all proceedings....

"The plain fact, however, is that in a marital dissolution proceeding the legislative grant of authority to the court to deal with custody or visitation matters is constricted by Civil Code section 4351 to the 'mi-

nor children of the marriage.' It follows that the court in such a proceeding is limited in regard to visitation orders in the same way as it is limited to adjudicating the rights of the parties in marital property. . . .

"If the rule were otherwise, then in a dissolution proceeding between 'A' and 'B' visitation rights to a child of 'C' and 'D' could be litigated simply because, during the marriage of 'A' and 'B', 'A' was like a father to the child and he could prove that it was beneficial to the child that he be awarded custody or visitation. That would be attempting to litigate the status of a child not before the court and, of course, would be absurd. Conceptually, however, the situation does not differ from that before us."

The court then held at page 485: "From what has been said, it follows that had Lonnie been a child of the marriage between Husband and Wife, then under the provisions of Civil Code section 4601 the court upon proper petition could have determined visitation rights of an uncle, grandparent, surrogate father, or 'any other person having an interest of the welfare of the child.' . . .

. "We do not find the result in this case particularly palatable. However, in view of the language in the relevant code sections, we feel compelled to hold the trial court had no jurisdiction to make any order concerning visitation in the proceeding before it. We are aware that in this modern society there are probably a considerable number of stepparents and stepchildren in situations substantially similar to that before us. The Legislature has the power to address this thorny problem of visitation by stepparents. We, on the other hand, cannot rewrite Civil Code section 4351 by a strained interpretation of the phrase 'minor children of the marriage' merely because one mother has made a decision which the trial court and probation department have determined is contrary to the child's best interest."

In view of the nature of the pleading and the contentions of the parties in the case at bar, the concurring opinion in *Perry* (p. 486) is of significance: "If husband had asserted in his response to the petition in the dissolution action that there were children of the marriage because he stood *in loco parentis* with regard to Lonnie, the superior court might have jurisdiction over the subject matter. In other words, if husband had raised the issue and had been found by the superior court to

be *in loco parentis* with regard to Lonnie, one could conclude that Lonnie was a 'child of the marriage' within Civil Code section 4351 . . . .

"However, husband did not allege he stands *in loco parentis* with regard to Lonnie and the issue of whether a finding in his favor on that question would make Lonnie a child of the marriage under Civil Code section 4351 for the purpose of visitation has not been briefed or argued. Therefore it would not be proper to determine such issue at this time.

"The trial court was obviously impressed by the close relationship which had developed over the years between Lonnie and his stepfather. That court also determined that visitation by the stepfather was in the best interests of the child. Therefore, it is with reluctance and solely under the compulsion of Civil Code section 4351 as now written, I agree the writ should issue."

The same result was reached in *In re Marriage of Jenkens* (1981) 116 Cal.App.3d 767 [172 Cal.Rptr. 331] but on different grounds and context. In a proceeding by maternal grandparents for modification of a Washington interlocutory dissolution decree awarding child custody to the mother, which proceedings had been instituted after the death of the father, the trial court awarded the grandparents extensive visitation rights in their Seattle home. The trial court found the mother to be a fit parent, but restricted her residence to a specified county and compelled her to undergo therapy. The appellate court issued a writ of mandate vacating the order, directing the trial court to award custody to the mother without limitations, stated at page 775: "California has at least eight separate procedures to obtain child custody. . . . It has also been held, normally, the first court to take jurisdiction of that issue may determine it. . . . Accordingly, it may not be of great importance whether this matter began as a modification procedure or some other custody determining procedure. What matters is the basic necessary finding. In all the cases, the requisite finding is of parental unfitness. That factor is absent here. On what authority, then, may the court order counseling and grant third party visitation? None is cited; we know of none. Can we contemplate the possibility of a conditional finding of unfitness, i.e., one is a fit parent only if she has counseling, stays in California and lets the grandparents influence the child? Such a finding does not foster family stability and continuity for the child. . . ."

Let us consider what is meant by and what are the features of subject matter jurisdiction. Grossman-Van Alstyne, 6 California Practice, Pleadings - Civil Actions (2d ed. 1981) section 33 states at page 31: "There is a fundamental distinction between the power of a court to render a decision and the question what that decision should be, assuming the power to exist. This distinction is clearcut as a matter of legal theory, however much it may tend to become blurred and confused in application. Before exploring specific situations and applications it will be well to expound the theory in the abstract.

"The basic features may be summarized in the form of three general postulates:

"(1) *'Jurisdiction of the cause attaches at the time of the commencement of the action.'* [citing *Gardiner v. Royer* (1914) 167 Cal. 238]

"(2) *Jurisdiction confers authority to decide the case either way.*

"(3) *Subject-matter jurisdiction that is otherwise lacking cannot be conferred by waiver, consent, or estoppel.*" (Italics in text.)

At the commencement of the case at bar, the court initially had power to adjudicate the custody of and visitation rights concerning Laurie since the original petition alleged that Laurie was the minor child of the marriage, and the response of Paul concurred. Although Gale later amended her petition to deny that Laurie was the child of the marriage, Paul always maintained this position in the "pleadings" (since form pleadings are used in family law proceedings, some of the niceties of conventional pleadings are not present). Also Paul maintained at the trial that because he stood *in loco parentis* that this creates an issue before the trial court as to whether Laurie is a "child of the marriage."[1]

At a time when the trial court concededly had "jurisdiction" of the issue of custody and visitation the court, pursuant to section 4359, subdivision (a), made a pendente lite order granting Paul certain visitation rights.

Testing whether the trial court had subject matter jurisdiction, the first postulate is met, since the court had jurisdiction at the time the ac-

---

[1]Paul's position is the same as that contained in the concurring opinion in *Perry v. Superior Court, supra*, 108 Cal.App.3d at 486, however in *Perry* the standing of the husband being *in loco parentis* was never raised in the pleadings.

tion commenced. When the trial court pendente lite granted initial rights of visitation to Paul it acted under the second postulate, since it had to determine one way or another whether to grant or to deny Paul the right of visitation. The trial court in the dissolution trial likewise had to determine all issues before it one way or another. The parties did stipulate that Paul was not the natural father of Laura since the tissue tests showed he could not be the biological father.[2]

For these reasons we hold that the trial court had jurisdiction to determine the issue of visitation in view of the pleadings and the positions of the parties before and during trial. Although we agree with the reasoning of *Perry*, the pleadings and positions of the parties in the latter case are markedly different than those in the instant case.

2. Whether Paul is the de facto parent of Laurie, although determination of this issue is not dispositive, since the best interest of Laurie is paramount.

a. By reason of the factual relationship between Paul and Laurie.

Appellant does not appear to assert that there was no substantial evidence to support the trial court's judgment, but rather takes the position that as a matter of law Paul is entitled, as the de facto parent, to certain legal rights, more precisely the right of reasonable visitation. But to arrive at that position, Paul first has to convince the trial court that he is the de facto parent. No findings were requested of the trial court, and hence every intendment is in favor of the judgment. A fair reading of the judgment of the court and the statements made by the trial judge shows that the court impliedly found there was no relationship of Paul to Laurie of "psychological parent," "de facto parent," or *in loco parentis*.[3] The trial judge stated: "It is not the situation where you have a child old enough to recognize a father and know what a father is and understands the concept of a father. This child was well under two years of age, so very frankly it is just patently almost ridiculous to make the assumption in spite of the doctor that the child knows

[2]Since the trial court approved the stipulation, and even refused to admit into evidence the tissue tests as at that point being irrelevant, it is not necessary to consider the situation where parties by stipulation act in a collusive manner in an endeavor to deprive the child (or the county) of the right to seek child support from the husband. See *Everett v. Everett* (1976) 57 Cal.App.3d 65 [129 Cal.Rptr. 8] in which the court held that a prior action adjudging defendant was not the father was collusive and hence not res judicata.

[3]The terms de facto parent (or father), *in loco parentis*, or psychological parent (or father) are used interchangeably in this opinion.

there is a father. This child knows there is a person, there is Mrs. Halpern and Mr. Halpern and they have been taking care of that child. That is all the child knows and to try to arrive at any other conclusion based upon some psychiatric testimony, frankly I just do not accept. .,. ."

Assuming arguendo that a person has properly utilized one of the eight or more California modes of alleging that he is the de facto parent of a minor child, let us examine the cases which have recognized the relationship of de facto parent to isolate the common factors present which would have inclined the courts to an award of custody or visitation.

(1) The child-de facto parent relationship is of long duration lasting, say, a minimum of six years: (*Clevenger* v. *Clevenger* (1961) 189 Cal. App.2d 658 [11 Cal.Rptr. 707, 90 A.L.R.2d 569]; *Loomis* v. *State of California* (1964) 228 Cal.App.2d 820, 822 [39 Cal.Rptr. 820]; *In re Lynna B.* (1979) 92 Cal.App.3d 682, 697 [155 Cal.Rptr. 256]; *In re Marriage of Valle* (1975) 53 Cal.App.3d 837, 842 [126 Cal.Rptr. 38]; and *In re Marriage of Johnson* (1979) 88 Cal.App.3d 848, 852 [152 Cal.Rptr. 121].)

(2) The child-de facto parent relationship involved reciprocal conduct between the child and the de facto parent, which the child manifests expressly, or impliedly, that the other person is his parent—the child being of sufficient age and understanding to understand the meaning of the parental relationship: (*Clevenger* v. *Clevenger, supra* 189 Cal.App. 2d 658; *In re Volkland* (1977) 74 Cal.App.3d 674, 679-680 [141 Cal. Rptr. 625]; *In re Marriage of Johnson, supra*, 88 Cal.App.3d 848; *In re Marriage of Valle, supra*, 53 Cal.App.3d 837; and *In re Lynna B., supra*, 92 Cal.App.3d 682.)

(3) The trial court did award, or would have awarded, visitation or custody upon a showing of detriment to the child if left solely with the custodial parent: (*In re B.G.* (1974) 11 Cal.3d 679, 696 [114 Cal.Rptr. 444, 523 P.2d 244]; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514]; *In re Reyna* (1976) 55 Cal.App.3d 288, 296 [126 Cal.Rptr. 138]; *In re Volkland, supra*, 74 Cal.App.3d 674; and *In re Marriage of Jenkens* (1981) 116 Cal.App.3d 767, 775 [172 Cal.Rptr. 331].)

In the case at bar the relationship between Paul and Laurie lasted only from birth to about one year; and Laurie was of such a tender age that she could not have comprehended the parental relationship. Appellant makes no charge that Gale is an unfit mother, and the trial court did not so find.

The balance between the best interests of the child in relation to the rights of the natural parent is stated definitively in *In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514]: "Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood. . . .

"'The relationship of . . . natural parent . . . [and] . . . children is a vital human relationship which has far-reaching implications for the growth and development of the child. . . . Thus, the involuntary termination of that relationship by state action must be viewed as a drastic remedy which should be resorted to only in extreme cases of neglect or abandonment. . . .

"Our decision in *In re B.G.* (1974) 11 Cal.3d 679 . . . emphasized the gravity of this right, holding that the doctrine preferring parental custody was not affected by the enactment of section 4600 except to focus 'attention not on the unfitness of the parent but the detriment of the child.' . . . *B.G.* permits custody to go to non-parents' . . . *only upon a clear showing that such award is essential to avert harm to the child.'* (11 Cal.3d 699.)" (Italics added.)

In *In re Marriage of Jenkens* (1981) 116 Cal.App.3d 767, 773 [172 Cal.Rptr. 331] the court stated: ". . . [t]he only ground to take the child from Jenkens is her unfitness, which the court declined to find. . . . It is conceded the child cannot be taken away from Jenkens without a finding of detriment, even under the Family Law Act."

The court also stated at page 774: "Civil Code section 4601 provides discretionary rights of visitation for non-parents, which, however, must give way to the paramount right to parent if the visitation creates conflicts and problems. . . .

"The critical importance in California of the right to parent has been affirmed and reaffirmed. . . . It only gives way upon a showing of parental unfitness, detrimental to the child's welfare."

Civil Code section 4600, subdivision (c) sets forth the following limitation on an award of custody to one not a parent: "Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a non-parent is required to serve the best interests of the child...."

The trial court lumped the various considerations entering into an award or denial of child visitation by holding that granting visitation rights to Paul would not be in the best interest of Laurie. There is substantial evidence to support this ruling, and this fact alone would be sufficient for us to affirm the judgment below.

Paul cites *Lloyd* v. *Lloyd* (1980) 92 Ill.App.3d 124 [415 N.E.2d 1105], in support of his contention that a husband who is not the natural father can be awarded custody of a minor child in preference to the natural mother. In *Lloyd*, husband and wife had been living together at the time of birth of the child in 1970. Since 1972 the child has lived with the husband, and at no time did the mother tell Nolan he was not the child's father, and a birth certificate was obtained showing him as the father. In 1974 the parties married, but wife moved out shortly thereafter. The child expressed a wish to live with the husband and not to live with the wife, during custody proceedings held after the dissolution had been granted. The trial court found both husband and wife to be fit parents, but determined it was in the best interest of the child that custody be given to the husband who, it was stipulated, was not the biological father. On appeal the custody award by the trial court to the husband was sustained.

Under the facts of *Lloyd*, the husband may have established that he was the de facto father and the child clearly regarded him as such. Also there were strong elements of estoppel. This factual situation is far different from the situation in the instant case, and the broad language of *Lloyd* cannot be reconciled with the California authorities stated above.

Therefore, Paul is not entitled as a matter of right or law to be considered to be the de facto parent of Laurie. Hence the trial court's implied finding must be sustained.

b. Whether Paul is the de facto parent of Laurie by reason of estoppel.

The court found that there is no estoppel of any kind to be imposed against Gale, and there is no estoppel in favor of Paul with respect to visitation. There is substantial evidence in the record to support such a finding, although Paul does not expressly challenge this finding for lack of substantial evidence. ■ For there to be estoppel by conduct all of the following elements must be present: (1) a representation or conceal-ment of material facts; (2) made with knowledge, actual or virtual, of the facts; (3) to a party ignorant, actually and permissibly, of the truth; (4) with the intention, actual or virtual, that the latter act upon it; and (5) the party must have been induced to act upon it. (*California Sch. Employees Assn.* v. *Jefferson Elementary Sch. Dist.* (1975) 45 Cal. App.3d 683, 692 [119 Cal.Rptr. 668].)

■ Paul urges that Gale led him to believe that (a) he was the fa-ther of Laurie, and (b) that he would have a relationship with Laurie; that he in turn invested his time, his money and himself into the rela-tionship; and that as a consequence she cannot now erase the relationship. There is a conflict of evidence concerning several, if not all, of the five elements of estoppel enumerated above as to both propo-sitions advanced by Paul—that is as to estoppel of Gale to deny that he is the natural father and estoppel to deny him the right to act as a de facto father.

Husbands have been estopped to deny paternity and have been forced to pay child support. (*In re Marriage of Johnson* (1979) 88 Cal.App.3d 848 [152 Cal.Rptr. 121]; *In re Marriage of Valle, supra,* 53 Cal.App. 3d 837; *Clevenger* v. *Clevenger, supra,* 189 Cal.App.2d 658.) This does not mean that the doctrine of estoppel automatically can be turned around to impose the relationship of a de facto father upon a wife who opposes it, and a child of tender years who individually certainly cannot be said to have committed any acts giving rise to estoppel. There may be circumstances in which a wife can be estopped from denying a hus-band the right to claim that he is the de facto father, but such circumstances certainly have not arisen in this case. The trial court's express finding and judgment in this respect are sustained.

3. Whether the trial court erred in denying Paul visitation rights con-cerning Laurie.

Assuming arguendo that Paul is correct in asserting that he has rights of visitation by reason of being *in loco parentis* and/or by the doctrine of estoppel, *the trial court has adjudged that visitation with*

*Paul is not in the best interest of Laurie.* ■ *Whether we consider the question of visitation under Civil Code sections 4600, subdivision (b), 4601 or any other section, the best interests of the child predominate when considering visitation privileges sought by those other than natural parents.* Whether or not Paul has raised the question on appeal of there being substantial evidence to support this finding and adjudication by the trial court, the record amply supports this portion of the trial court's judgment.

■ 4. Whether the trial court erred in denying a psychiatric examination of the mother and child.

At the time the trial court was presented with the request by motion pendente lite ·to permit a psychiatric examination the court was informed that the tissue tests excluded Paul as being the natural father. Gale's fitness as a mother was at no time put in issue by the "pleadings" or by contention of Paul at trial. Code of Civil Procedure section 2032, subdivision (a) provides in part: "In an action in which the mental . . . condition . . . of a party, . . . or a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending *may* order the party to submit to a . . . mental . . . examination . . . or to produce for such examination . . . the person in his custody or legal control. . . ." (Italics added.)

As to the obligation of Gale, the mother, to submit to a mental examination there was no issue in controversy involving her. In *Reuter* v. *Superior Court* (1979) 93 Cal.App.3d 332 [155 Cal.Rptr. 525], plaintiff brought an action for the wrongful death of her husband in both her individual capacity and as guardian ad litem for her minor son who was injured in the same accident. The trial court issued an order to compel the mother, as well as the son, to take a series of psychological tests ·as well as interviews by a psychologist. The appellate court issued a writ of mandate deleting the requirement that the mother submit to such tests and interview, since Code of Civil Procedure section 2032 did not authorize an examination of the mother on the basis· of her status as guardian ad litem. The mother could not be compelled to submit to the tests even though the son's mental condition was in controversy, and it was medically necessary for her to take tests to establish the son's mental condition.

*Reuter*, in principle, is closely analogous to the principles involved in the case at bar. If Paul had contended that Gale were an unfit mother

and Gale were to have responded that she was a fit mother, then the psychological condition of Gale would be at issue and she might, under these circumstances, have to submit herself to psychological testing and interview. There being no issue as to Gale, the trial court would have been without power to order her to submit to psychiatric examination. (See *Simek* v. *Superior Court* (1981) 117 Cal.App.3d 169 [172 Cal.Rptr. 564]; *Koshman* v. *Superior Court* (1980) 111 Cal.App.3d 294 [168 Cal.Rptr. 558].)

As to examination of Laurie, the court denied an order for examination without prejudice to its renewal. The trial court had the right to consider the burden and inconvenience of psychiatric examination of Laurie, the probable irrelevance since Paul was not the natural father of Laurie, and the doubtful benefit of a psychiatric examination of a child under two years of age. The statute places in the sound discretion of the trial court whether to order such a psychiatric testing of Laurie and we see no reason to override the court's exercise of that discretion. (See *Edwards* v. *Superior Court* (1976) 16 Cal.3d 905 [130 Cal.Rptr. 14, 549 P.2d 846].)

■ Respondent contends that appellant may not raise this issue on appeal because the order denying a psychiatric examination has never been appealed from. We do not agree. Appellant again sought, but was denied, a psychiatric examination after the dissolution trial, and also sought a writ of supersedeas which was denied. Since the pretrial order denying a psychiatric examination was not appealable at the time the order was issued, it is appealable along with the other issues raised in this appeal, since appellant does appeal from that portion of the interlocutory judgment adjudging that Paul is not the father of Laurie and that visitation is denied him.

The judgment is affirmed.

Ashby, Acting P. J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 25, 1982.