[Civ. No. 28281. Fourth Dist., Div. One. Jan. 25, 1984.]

In re ROBERT D., a Minor.
LISA D. et al., Petitioners and Appellants, v.
CAROL F. et al., Objectors and Respondents.

COUNSEL

Hunter & Ryan and Daniel B. Hunter for Petitioners and Appellants.

Daniel P. Larkin and Sandra Joan Morris for Objectors and Respondents.

OPINION

WIENER, J.—We confront here the issue of the right of grandparent visitation of a child where the parents and maternal grandparents have less than a congenial relationship. We conclude that in spite of the continuing internecine conflict substantial evidence supports the court's order permitting grandparent visitation under Civil Code section 4601.[1]

*Factual and Procedural Background*

Plaintiff Lisa D. is the natural mother and Thomas D. is the adoptive father of six-year-old Robert. The D.s were married on May 5, 1980. The defendants Carol F. and Raymond F. are the maternal grandparents of Robert (grandparents). On September 18, 1978, Lisa was granted care, custody and control of Robert in an Illinois judgment of dissolution. Before that date she had left Robert in the temporary care of her parents. After her marriage

---

[1] All statutory references are to the Civil Code.
Section 4601 provides: "Reasonable visitation rights shall be awarded to a parent unless it is shown that such visitation would be detrimental to the best interests of the child. In the discretion of the court, reasonable visitation rights may be granted to any other person having interest in the welfare of the child."

to Thomas, Lisa sought the return of Robert. When her parents refused, Lisa petitioned this court for a writ which was set for hearing with a return date of July 15, 1980. Pending that hearing the grandparents filed a petition for adoption and a petition for freedom from parental custody and control alleging the minor had been abandoned (§ 232). Lisa opposed these petitions. On August 13, 1980, the parties, through counsel, orally stipulated to provide physical possession of Robert in his grandparents until November 15, 1980, when custody was to be transferred to Lisa subject to visitation rights of the grandparents.[2]

About two years later Lisa, joined by her husband, moved to "vacate" the stipulated order. Declarations accompanying her motion explained that the order substantially interfered with the rights to parent the child. The grandparents opposed the motion and requested the court order a conciliation court investigation and report regarding the custody and visitation. After receiving the oral report of the family services division counselor (Dean Metzner) the court ordered:

"B. The Court further finds that it is in the best interest of the child to continue a visitation schedule with Respondents/Grandparents CAROL and RAYMOND F.

"The court finds that is in the best interest of the minor child, ROBERT, to continue the visitation between the grandparents and the child on the following terms and conditions:

"1. The Respondent/Grandparents shall have the child one weekend per month from 6:00 p.m. on Friday to 6:00 p.m. on Sunday. The weekend shall be designated by the Petitioner/Mother, and she shall inform the Respondent/Grandparents on or before the 20th day of the preceding month as to the weekend they shall have the visitation.

"2. All parties to this action, which include the parents and grandparents shall participate in psychological counseling to work out further visitation problems, and the parents shall bring the child to such counseling as is deemed necessary by the psychologist. They shall use a mutually agreed upon psychologist and Respondents shall pay the initial $500.00 for the

---

[2]The order for visitation provided in pertinent part as follows: "Commencing Thursday, June 11, 1981, and continuing until further order of . . . court, visitation with the [grandparents] once each and every month from 7:00 p.m. on the SECOND Thursday of the month until 7:00 p.m. on the following Sunday. [¶] . . . [Grandparents] shall also have the right to a summer visitation . . . for a period of two (2) weeks if, at the time of the visitation, both parties are residing within the state of California, and for a period of one (1) month if either party is residing outside of the state."

counseling of the parties. All charges thereafter shall be shared equally between the Petitioners and the Respondents." The parents appeal this order.

## I

The parents contend they have encountered substantial difficulties with what they consider interference by the grandparents with the parenting of their son. Specifically, they point to the grandparents' past refusal to cooperate in toilet training and in the weaning process, the grandparents' refusal to return Robert from visitation when ill and causing treatment by a doctor not knowledgeable concerning their son's condition, the grandparents' spoiling of Robert with resultant difficulties in raising him, the grandparent's provision of dental treatment without permission when the grandparents knew the child had his own dentist, the grandparents' continuing coldness and hostility to the parents which rendered the parties' ability to communicate with each other impossible, thus constituting a serious impediment to plaintiffs' ability to parent. When the parents perceived the interference of the grandparents to be too great, the present proceedings to modify the previous order were commenced.

Before the hearing the parties met with counselor Metzner. At the hearing he recommended counseling not because of the psychopathology of the child or any of the parties but counseling "focusing on the needs of the child, which is one of the things that has been at issue over the past couple of years [which] would be certainly helpful in this case." Metzner confirmed the existence of conflict between the parents and grandparents as to how the child should be raised.

Before the effective date of the Family Law Act, no statute provided for visitation rights in anyone other than the father and mother except for the provision in section 197.5 which permits visitation orders in favor of grandparents in cases where the grandparents' child was deceased. That provision is still effective but not applicable here for both parents are living. In earlier California cases orders have been made granting grandparents rights of visitation and were upheld. In these cases, visitation orders were granted upon stipulations of the parents. (See *Bookstein* v. *Bookstein* (1970) 7 Cal.App.3d 219 [86 Cal.Rptr. 495]; *Benner* v. *Benner* (1952) 113 Cal.App.2d 531 [248 P.2d 425]; *Kentera* v. *Kentera* (1944) 66 Cal.App.2d 373 [152 P.2d 238].) *Perry* v. *Superior Court* (1980) 108 Cal.App.3d 480, 482 [166 Cal.Rptr. 583], construed section 4601 "to permit the court to award reasonable visitation rights to a nonparent only if in the proceeding before it the court otherwise has jurisdiction over the issue of custody." The need for juris-

diction over the custody issue was emphasized by this court in *In re Marriage of Jenkens* (1981) 116 Cal.App.3d 767, 774 [172 Cal.Rptr. 331].

The right to parent can only give way upon a clear and convincing showing of parental unfitness and detriment to the child. However, we are not here concerned with an award of custody but simply a temporary right of visitation. The right of visitation while not being equivalent of full custody is a limited form of custody during the time the right is being exercised. (See *Perry* v. *Superior Court, supra,* 108 Cal.App.3d at p. 483.) Against this conceded intrusion on the right to parent must be measured the section 4601 grant of right of reasonable visitation where the interests and the welfare of the child are to be benefited.

■ The parents argue that *In re Marriage of Jenkens, supra,* 116 Cal.App.3d 767 requires and authorizes the denial of grandparent visitation. However, *Jenkens* was determined as a jurisdictional question as was *Perry.* In *Jenkens,* the trial court was without jurisdiction, in a proceeding for modification, to adjudicate the visitation rights of the grandparents where a State of Washington interlocutory dissolution decree had awarded the child's custody to the mother and the modification proceeding had been instituted after the death of the child's father. The grandparents had no standing to contest the surviving parent's right to exclusive custody of the child, had no judicially recognized basis from which to demand visitation, absent their institution of a distinct custody proceeding in which they need prove the mother's unfitness. Here, however, the question of visitation rights originated in a custody proceeding involving the grandparents, not a dissolution proceeding. The jurisdictional question is not present.

■ Deciding jurisdiction does not conclude this matter. The principal issue before us is whether there is sufficient evidence to support the order. Even in child custody matters appellate review is governed by the substantial evidence rule. (See *Guardianship of Phillip B.* (1983) 139 Cal.App.3d 407, 413-414 [188 Cal.Rptr. 781].) ■ Trial courts have very extensive discretion in determining what will be in the best interests of a child and " '. . . the conclusion arrived at by . . . courts in such cases will not be set aside unless the record discloses a clear abuse of discretion.' [Citation.] . . . ■ It is the province of the trial court to judge the effect and value of the evidence, determine the credibility of witnesses and resolve the conflicts in the evidence or in the reasonable inferences to be drawn from the evidence. When the evidence is conflicting, the 'appellate court will indulge all intendments and reasonable inferences which favor sustaining the finding of the trier of fact and will not disturb that finding when there is substantial evidence in the record in support thereof [citation].' [Citations.]" (*Bookstein* v. *Bookstein, supra,* 7 Cal.App.3d at p. 224.)

■ Here, the court found there was an advantage in having four parents rather than just two. The court decided it would be in the best interest of the child to maintain the grandparent relationship. This finding is supported by the recommendation of the counselor who concluded after interviewing the parties that continuing grandparent contact would be in Robert's best interest. Except for the declarations by the parents, the record is devoid of contrary evidence. The events to which the parents refer such as cooperation in toilet training and the weaning process have long since passed. The court's present order satisfactorily addresses the grandparents' alleged interference with Robert's medical and dental treatment.

While this record reflects a sad story of intrafamily discord with continuing hostilities we cannot preempt the trial court's factfinding responsibility. Although the adversary forum of the trial court is admittedly an unsatisfactory arena to resolve the sensitive issues involving child custody, the court's use of the family conciliation court for a mediation proceeding was consistent with its efforts to reach a Solomon-like decision. There is no suggestion the parents were prevented from presenting relevant evidence from any source on the issue of what they believed to be in the best interests of their child. As a tactical matter the parents' able trial counsel elected to restrict his advocacy to the legal issues supporting his clients' position. Thus, on this limited record absent a factual basis, we cannot say the conflict here precludes grandparent visitation.

Grandparent visitation is beneficial for a child's development allowing for the establishment and later maintenance of an important familial relationship extending beyond childhood. Conceptually, depriving a child from his or her grandparents sets the child apart from his peers and impedes rapport between "natural" family. Unless family ties are maintained, later attempts at rekindling the family flame become awkward if not impossible.

This record reflects the court's appreciation of the practical problems and theoretical benefits of grandparent visitation. Sensitive to the issues, the court here weighed and considered the evidence. We cannot say the result reached was a clear abuse of the court's discretion and accordingly affirm that part of the court's order continuing grandparent visitation.

## II

■ We have some discomfort with the order for psychological counseling, however. We use the word "discomfort" because the parents' counsel failed to object to that order and at trial appeared to acquiesce to the order for counseling agreeing to submit the name of a mutually satisfactory counselor. Nonetheless, the order was made without any showing of unfairness,

inability or unwillingness by the plaintiffs to perform their parental duties. In *Jenkens,* the trial court had compelled the mother to undergo counseling. There we said: "In all the cases, the requisite finding is of parental unfitness. That factor is absent here. On what authority, then, may the court order counseling and grant a third party visitation? None is cited; we know of none." (*In re Marriage of Jenkens, supra,* 116 Cal.App.3d at p. 775.) As is pointed out in *In re Marriage of Halpern* (1982) 133 Cal.App.3d 297, 316 [184 Cal.Rptr. 740], there being no issue as to psychological condition of a parent the trial court was without power to order such person to submit to a psychiatric examination. While counseling rather than a psychiatric examination was the objective of this particular order, the most this or any other court may do is express the thought that psychological counseling of this mother and these grandparents might have a most valuable and beneficial effect of reducing intrafamily tensions. But such counseling cannot be forced, no authority exists for compelling it. Accordingly, the order must be modified to delete the requirement for psychological counseling.

*Disposition*

The order is modified to delete the requirement of psychological counseling. Except as so modified, the order is affirmed.

Work, J., concurred.

**STANIFORTH, Acting P. J.**—I respectfully dissent.

My brethren see this case factually as involving "less than a congenial relationship" between the mother and maternal grandparent. In reality, the facts show both a bitter and prolonged legal and interfamilial battle over custody and visitation with the now five-year-old Robert. These are the uncontested facts underlying the partial list of parental complaints recited by the majority (majority opn., *ante,* p. 394):

On September 18, 1978, Lisa was granted care, custody and control of Robert in a judgment for dissolution of her previous marriage entered in the State of Illinois. Before that date Lisa had left Robert in the grandparents' temporary care. Following her remarriage on May 5, 1980, Lisa sought the return of Robert but the grandparents refused and Lisa filed a petition for writ in this court. To counter the mother's legal action, the grandparents filed a petition for adoption and a petition for freedom from parental custody and control (Civ. Code, § 232), alleging Robert had been abandoned as defined by Civil Code section 232. Lisa opposed the grandparents' petitions. Thereafter on August 13, 1980, Lisa and the grandparents, through counsel, orally stipulated to provide physical possession of

Robert in the grandparents until November 15, 1980, when Robert was to be transferred to Lisa subject to the rights of the grandparents to visit.

Approximately two years later (May 5, 1982) Lisa filed a motion seeking, among other things, to vacate in its entirety the stipulated order. The motion was accompanied by declarations based upon the contention the stipulated order substantially interfered with the D.s' right to parent Robert. The grandparents countered with a request to deny Lisa's motion and asked that the court order a conciliation court investigation and report regarding custody and visitation.

## I

In this setting the majority would decide a profound factually multifaceted, legally thorny issue—the welfare of the child—on the narrow legalistic ground of whether the trial court abused its discretion in granting visitation rights to the grandparents, i.e., whether "there is sufficient evidence to support the order." (Majority opn., *ante,* p. 396.) This prefatory legal rubric is but the threshold of the needed analysis where grandparent-parent-child relationships are the subject matter. The point of beginning for the admeasurement of the principles governing the granting of visitation privileges (as well as the granting of custody) is *the best interest and welfare of the child* (*In re Marriage of Halpern* (1982) 133 Cal.App.3d 297, 315 [184 Cal.Rptr. 740]) viewed against the backdrop of the statutory and constitutionally created rights and obligations of parenting.

In this case fundamental parenting rights were affected by the exercise of discretion by the trial court. It was said in *In re Carmaleta B.* (1978) 21 Cal.3d 482, 496 [146 Cal.Rptr. 623, 579 P.2d 514]: "[W]e recognize that such discretion can only be truly exercised if there is no misconception by the trial court as to the legal basis for its action."

The trial court's making the child a football in the game of life rather than a player must be examined in light of certain controlling legal constitutional premises. "Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood. Thus, the court in *In re T. M. R.* (1974) 41 Cal.App.3d 694, 703 . . . , held: 'The relationship of . . . natural parent . . . [and] . . . children is a vital human relationship which has far-reaching implications for the growth and development of the child. (See Kay & Phillips, *Poverty and the Law of Child Custody* (1966) 54 Cal.L.Rev. 717. . . .'" (*In re Carmaleta B., supra,* at p. 489.)

An earlier appellate court decision *Odell* v. *Lutz* (1947) 78 Cal.App.2d 104, 106 [177 P.2d 628], stated this verity: "Although the rights of par-

enthood are not absolute, but subject to the superior right of the state to intervene and protect the child against abuse of parental authority, the state may not constitutionally interfere with the natural liberty of parents to direct the upbringing of their children. 'The judicial power of the state, exercised through its courts, is concerned mainly with the *custody* of the child, which, under appropriate laws, may be brought under a court's supervision by guardianship proceedings, proceedings directly affecting the custody of the child, or suits for divorce or separation.' (Italics added.) (39 Am.Jur. 603.) . . . . The supremacy of the mother and father in their own home in regard to the control of their children is generally recognized. 'It is said that the natural rights of a father . . . are greater than those which any guardian can have. . . . *The legal obligations of parenthood include the duties of support, of care and protection, and of education. As compensation therefor, the law recognizes certain rights in the parent. . . . So fundamental are the rights of parenthood that infringements thereof have been held to constitute an encroachment on the personal liberty of the parent forbidden by the Constitution. . . .*' (39 Am.Jur., pp. 593, 594.)" (Italics added.)

The right of visitation, while not the equivalent of full custody, is a limited form of custody during the time the right is exercised. (See *Perry* v. *Superior Court* (1980) 108 Cal.App.3d 480, 483 [166 Cal.Rptr. 583].) Against this conceded intrusion on the right to parent must be weighed the importance of the family. (See *Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208].) "The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer* v. *Nebraska,* 262 U.S. 390, 399 . . . . 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents . . . .' *Prince* v. *Massachusetts,* 321 U.S. 158, 166 . . . ." (*Ibid.*)

Most recently the United States Supreme Court in *Santosky* v. *Kramer* (1982) 455 U.S. 745, 753 [71 L.Ed.2d 599, 606, 102 S.Ct. 1388, 1394], reaffirmed the fundamental nature of the right to parent: "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." And the United States Supreme Court in *Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18, 27 [68 L.Ed.2d 640, 649-650, 101 S.Ct. 2153, 2159], stated: "This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' . . . A parent's interest in the accuracy and injustice of the decision to terminate his or her parental status is therefore a commanding one." (Fn. omitted.) See also the *Lassiter* dissent (Black-

mun, J.) pages 38-39 [68 L.Ed.2d at p. 657], where three justices agreed: "Within the general ambit of family integrity, the Court has accorded a high degree of constitutional respect to a natural parent's interest both in controlling the details of the child's upbringing, [citations] and in retaining the custody and companionship of the child, [citations]."

Most recently a perceptive California appellate court in *In re Marriage of Mentry* (1983) 142 Cal.App.3d 260, 267-268 [190 Cal.Rptr. 843], said: "The concept of family privacy embodies not simply a policy of minimum state intervention but also a presumption of parental autonomy. Many of the purposes served by this presumption become more important after dissolution than they were before. One such purpose, for example, is to diminish the uncertainties and discontinuities that can afflict the parent-child relationship whenever third parties (lawyers as well as judges) episodically intrude through an ill-equipped adversarial process in which decisions are subject to reconsideration and eventual appellate review. Such uncertainties and discontinuities are of course more likely and serious dangers after separation or dissolution than before." (Fn. omitted.) The same court said in *In re Marriage of Wellman* (1980) 104 Cal.App.3d 992, 996 [164 Cal.Rptr. 148]: "*[T]he state has no general authority to dictate to parents the manner in which they should rear their children.* '[C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." ' (*Ginsberg* v. *New York* (1968) 390 U.S. 629, 639 . . . ." (Italics added.) See also *Stanley* v. *Illinois, supra,* 405 U.S. 645, 651 [31 L.Ed.2d 551, 558, 92 S.Ct. 1208], where the Supreme Court made it plain "that the interest of a parent in the companionship, care, custody, and management of his children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' *Kovacs* v. *Cooper,* 336 U.S. 77, 95 . . . ."

Thus there is a wealth of authority which reflects a judicial disinclination to interfere with family privacy in the absence of evidence establishing a "compelling need." (*In re Carmaleta B., supra,* 21 Cal.3d 482, 489, 495-496; *In re Marriage of Mentry, supra,* 142 Cal.App.3d 260, 267; *In re Marriage of Murga* (1980) 103 Cal.App.3d 498, 505-506 [163 Cal.Rptr. 79].)

Furthermore, there is a growing judicial sensibility that intervention may create a more serious problem than that it purports to remedy. (See *In re Marriage of Mentry, supra,* at p. 270; *Kilgrow* v. *Kilgrow* (1958) 268 Ala.

475 [107 So.2d 885]; *Lynch* v. *Uhlenhopp* (1956) 248 Iowa 68 [78 N.W.2d 491].) The vast majority of matters concerning the upbringing of children must be left to the conscience, patience, and self-restraint of parents. No end of difficulties would arise should judges try to tell parents how to bring up their children. (*People* ex rel. *Sisson* v. *Sisson* (1936) 271 N.Y. 285, 287 [2 N.E.2d 660, 661]; see also *Kilgrow* v. *Kilgrow, supra,* 107 So.2d 885.) This is precisely what the trial court has here ordered.

One further constitutional consideration must be factored into any decision to sustain or reverse this order, to wit: the standard of proof requirement of which the trial court must be made consciously aware before interfering with parental rights. This is not a civil dispute over money damages where the application of the "preponderance of evidence" standard indicates society's minimal concern with the result and therefore that the litigants should "share the risks of error in roughly equal fashions." (*Addington* v. *Texas* (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 330, 99 S.Ct. 1804, 1808].) Nor is it a criminal dispute where the stringent "beyond a reasonable doubt" standard tells us of the weight and gravity of the private interest involved and society's interest in avoiding an erroneous conviction.

Rather the standard here where parental rights are fundamental, and societal interest in avoiding error with its enormous consequences must require at least clear and convincing evidence be produced. This is a matter fraught with potential danger to this child if error is committed in deciding the dispute. (See *Santosky* v. *Kramer, supra,* 455 U.S. 745, 754-766 [71 L.Ed.2d 599, 607-615, 102 S.Ct. at pp. 1395-1401]; *Addington* v. *Texas, supra,* 441 U.S. 418, 425.) Furthermore, "[T]he litigants and the factfinders must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance." (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 757 [71 L.Ed.2d at p. 609, 102 S.Ct. at p. 1396]; italics added.) The record here reflects a failure by the trial court to reach its decision in the compelling light of these fundamental and controlling principles.

The factual record points unerringly to the rational conclusion that hostilities have continued through the years, escalating with the grandparents' unsuccessful bid to free the child from the mother's custody on the ground of abandonment. Without doubt, judicial resolution of the custody dispute has failed to quell these hostilities or improve the parties' relationship. Robert continues to be an innocent pawn in the ongoing battle. The parents' allegations of intermeddling have gone unchallenged, leading to the conclusion the grandparents have seriously interfered in the parenting function.

Evidence of the nature here presented that warranted the court in *Adoption of Berman* (1975) 44 Cal.App.3d 687, 697 [118 Cal.Rptr. 804], to conclude

it was better for the children that the grandparents abstain from all contact with them until a unified and congenial family atmosphere was established with the grandparents ultimately included. The wisdom and rationality of such a hold in place order is most appealing. In the instant case, whether the mother is right or whether the grandparents are right, the fact of hostility to a marked degree is conceded. To place the child unnecessarily in the midst of such a battle is patently not in his best interests.

Robert has been in his mother's custody since November 1980. Therefore, this is not a situation where the child has lived continuously with the grandparents over a long term; denying the grandparents visitation rights will not sever strong emotional bonds such as these which exist between a child and his or her psychological parents. While the family services division counselor is hopeful counseling will help ameliorate the family feud, this hope is naught but a pie in the sky. The present underlying reality is interfamily hostility with the child at the leading edge of the fight.

## II

The scholarly authorities are in wordy dispute as to how to resolve the issue raised here. Goldstein, A. Freud and A. Solnit in the context of parent visitation found that children have difficulty in relating positively to and profiting from contact with two parents who are not in positive contact with each other. (Beyond The Best Interests Of The Child (1979 ed.) at pp. 37-38.) The authors note: "Loyalty conflicts are common and normal under such conditions and may have devastating consequences by destroying the child's positive relationships to both parents." (*Id.*, at p. 37.) Foster and Freed note: "If visitation is a constant source of friction, all relationships may be impaired and the child may become the principal victim regardless of who was most to blame for the difficulty." (*Grandparent Visitation: Vagaries and Vicissitudes* (1979) 23 St. Louis U. L.J., 643, 664.) Our ruling here must protect Robert from the "devastating consequences" of being pulled between parents and grandparents to the extent he lacks a positive relationship to either set.

In the short run, the practical result of the decision for nonvisitation would be that the parents will dictate the extent of any relationship Robert has with his grandparents. It is therefore reminiscent of Goldstein, Freud and Solnit's controversial recommendation that, upon divorce, the custodial parent shall have the right to decide whether the noncustodial parent may visit with the child. (See Beyond The Best Interests Of The Child, supra, at p. 38.)

Numerous authorities have examined this recommendation (see, e.g., Katkin, et al., *Above and Beyond the Best Interests of the Child: An Inquiry*

*Into the Relationship Between Social Science and Social Action* (1974) 8 Law & Soc'y. Rev. 669, 680; Foster, *A Review of Beyond the Best Interests of the Child* (1974) Bull. Am. Acad. Psychiatry & L. 2:46, reprinted in 12 Williamette L.J. 545 (1976)). Foster criticized it on the ground, among others, that dissolution of a marriage does not terminate the parent-child relationship, and the child ordinarily needs and is entitled to an ongoing relationship with both parents. (12 Williamette L.J. at p. 551.) On similar reasoning, Foster and Freed later suggested "there is no convincing reason why the existence of a state of animosity should have any more effect when *grandparents* seek visitation than it does where visitation is awarded to the other parent." (*Grandparent Visitation, supra,* at p. 675; italics added.) Another commentator would deny grandparent visitation whenever there is a *"possibility* that parental authority will be deliberately undermined," because "the relationship which obviously is of primary importance to the child is that which he has with his parents." (Note, *Visitation Rights of a Grandparent Over the Objection of a Parent: The Best Interests of the Child* (1976) 15 J. Fam. L. 51, 75; italics added.)

III

While the authorities may be in philosophical dispute as to how to resolve this dilemma, there is legislative support for disparate treatment of parents and grandparents with regard to visitation rights where animosity exists between parent-parent and parent(s)-grandparent(s), respectively, in the two standards for granting visitation set out in Civil Code section 4601. Under this section, parents *must* be awarded visitation unless it is shown visitation would be detrimental to the child's best interests. Other interested parties (including grandparents) *may* be granted visitation, in the court's discretion. Juxtaposed, the two standards clearly support the proposition parental right of access to the child is paramount to that of grandparents. Serious interference with the parenting function warrants denial of grandparent visitation, while one parent's interference with the parenting function of the other parent may not.

An amendment to Civil Code section 4351.5, effective January 1, 1984, while not applicable to this action,[1] provides additional legislative support for disparate treatment of parents and grandparents with regard to visitation rights when animosity among contesting parties exists. Prior to its amendment, section 4351.5 granted trial courts discretion to award to a stepparent

---

[1]In order for this cause to be governed by section 4351.5 the grandparents would have had to seek visitation rights in a proceeding for nullity of marriage, legal separation, or dissolution proceedings in which daughter Lisa was involved. (See § 4351.5, subd. (b).

reasonable visitation rights with the minor child of the other party to the marriage, upon declaration of nullity of the marriage, dissolution, or legal separation, if visitation is determined to be in the child's best interests. (See § 4351.5, subd. (a).) The amended section grants trial courts further discretion to award reasonable visitation rights to a *grandparent* of a minor child in the course of the above-described proceedings, if visitation is determined to be in the child's best interests. (See § 4351.5, subd. (b)). A further amendment directs: "There shall be a rebuttable presumption affecting the burden of proof that the visitation of a grandparent is not in the best interests of a minor child if the parties to the marriage agree that the grandparent should not be awarded visitation rights." (§ 4351.5, subd. (k).) This case should be guided by the Legislature's wisdom as reflected in Civil Code section 4351.5, subdivision (k), that parents' wishes regarding the upbringing of their child—specifically whether grandparents should be awarded visitation rights with the child—should prevail.

I would conclude to compel visitation under the foregoing circumstances is an abuse of discretion on the part of the trial court and an interference with the constitutional protected right to parenting, all to the detriment of this child. Civil Code section 4601's discretionary grant of visitation to nonparents does not warrant placing Robert amid the admitted warring of parents and grandparents. A lawful, constitutional, child protective order should read: "The evidence shows that the constant turmoil between the parties is . . . a 'battle' in which the children are the ones most likely to get hurt. The grandparents undoubtedly exhibit great love and concern for the children, but unfortunately the circumstances are such that it is better for the children that the grandparents abstain from all contact with them, until such as there exists '. . . a unified and congenial family atmosphere with the grandparents ultimately included. . . .' " (*Adoption of Berman, supra,* 44 Cal.App.3d 687, 696.) Instead, the trial court has assumed the role of the black robed and hatted French magistrate (as depicted in the classic Honore Daumier wash drawing) who looks benignly down upon the confused and angry litigants and ingenuously announces: "The parties are to be reconciled."

A petition for a rehearing was denied February 10, 1984. Staniforth, J., was of the opinion that the petition should be granted. Appellants' petition for a hearing by the Supreme Court was denied April 4, 1984. Bird, C. J., was of the opinion that the petition should be granted.