408 S.E.2d 625

**KENNETH L. W., Plaintiff Below, Appellee,**

v.

**TAMYRA S. W., Defendant Below, Appellant.**

**No. 19735.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 15, 1991.

Decided July 17, 1991.

Rehearing Denied Sept. 5, 1991.

Delby B. Pool, Clarksburg, for appellant.

LaVerne Sweeney, Grafton, for appellee.

**PER CURIAM:**

The appellant, Tamyra S.W.,[1] appeals from a March 5, 1990, order of the Circuit Court of Barbour County granting custody of her two infant children to their natural father, appellee Kenneth L.W. The appellant contends that she is entitled to custody of the two children, Jared and Drew, and maintains that the trial court erred by (1) failing to correctly apply the primary caretaker standard, (2) failing to make findings of fact and conclusions of law sufficient to support a decision that the appellee was better suited or more competent to have custody of the children, and (3) concluding that the best interests of the children would be served by placing them in the custody of their father.

Upon review of the record, we find that the trial court erred by determining that neither party was entitled to the primary caretaker presumption and incorrectly held that the best interests of the children would be served by placing them in the custody of their father. Furthermore, we believe that the evidence clearly supports a conclusion that the mother, appellant Tamyra S.W., was the primary caretaker of the children. Accordingly, we reverse the decision of the Circuit Court of Barbour County.

## I.

Kenneth L.W. and Tamyra S.W. were married on September 3, 1982, in Barbour County, West Virginia, and the marriage produced two children, Jared L.W. born September 9, 1983, and Drew T.W., born March 7, 1986. The marital relationship apparently began to disintegrate shortly after the birth of the first child when the appellant and the appellee ceased cohabiting together on a consistent basis. In January 1989, the appellant began an adulterous relationship with a Mr. Mike M. She testified that she was absent from the marital home for occasional daytime visits with Mr. M. and that she also visited Mr. M. for

1. We adhere to our traditional practice in domestic relations and other sensitive cases and do not use the full names of the parties. *See* e.g., *Nancy Viola R. v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1967), *West Virginia Dept. of Human Serv. v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d 632 (1985).

two overnight stays while he was working in Indianapolis, Indiana. In preparation for these occasional ventures, she misrepresented her plans to her husband and borrowed automobiles from friends. The appellant also admits to later having a brief affair with a second individual, a Mr. Steve W. The appellant apparently did not engage in any overnight ventures away from her children with Mr. W.

The appellee filed for divorce in May 1989. Hearings were held before Family Law Master James H. Ware on July 19, 1989, and August 9, 1989. Family Law Master Ware, after hearing evidence presented by both parties, determined that a divorce on the grounds of adultery should be granted and that custody of the two children should be given to the appellee. Specifically, the family law master found the evidence regarding primary caretaker status to be conflicting and determined that neither party was entitled to the primary caretaker presumption. Consequently, proceeding to a determination of the best interests of the children, the family law master found that the best interests of the children would be served by placing them in the custody of their father. The family law master remarked on the appellant's marital misconduct, stating the following:

> With one major exception, the marital difficulties expressed by the parties are unremarkable. However, that major exception focuses on Mrs. [W.'s] admitted absences from the home, and from the state, for the purpose of engaging in adulteress (sic) affairs.

> Mrs. [W.], through counsel, has argued that adultery is not necessarily a relevant consideration when considering the issue of custody. However, Mrs. [W.'s] admitted absences from the home for that purpose suggests (sic) an attitude that, to me, is inconsistent with the quality of parenting expected of a custodial parent, particularly in the areas of responsibility, loyalty and morality.

Upon review of the family law master's recommendation, the circuit court adopted this and other findings of fact and conclusions of law of the family law master, except that the court determined that a divorce on the grounds of adultery should not be granted since the parties voluntarily cohabited after the appellee learned of the appellant's adulterous conduct. While the appellant had remained in the marital home during the divorce proceedings, she left the home when ordered to do so by the circuit court in January 1990. With regard to the placement of the children, the court followed the recommendation of the family law master in finding that neither party was the primary caretaker and in determining that custody in the appellee was in the best interests of the children. The court stated in the order that the decision was not based upon the appellant's adulterous conduct. It is from that March 5, 1990, final order of the circuit court that the appellant now appeals.

## II.

■ We have repeatedly held that the custody of children of tender years should be awarded to the primary caretaker of those children. In syllabus point 2 of *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981), we stated the following: "With reference to the custody of very young children, the law presumes that it is in the best of interests of such children to be placed in the custody of their primary caretaker, if he or she is fit."

■ In syllabus point 3 of *Garska*, we explained that "[t]he primary caretaker is that natural or adoptive parent who, until the initiation of divorce proceedings, has been primarily responsible for the caring and nurturing of the child." 167 W.Va. at 59, 278 S.E.2d at 358. We also enunciated several duties which are encompassed within the definition of primary caretaker. These include such basic caretaking duties as preparation of meals, grooming, medical care, discipline, and education.[2] *Id.*, 167

---

**2.** *Garska* specifically enunciated the following examples of duties of a primary caretaker:

'(1) preparing and planning of meals;

(2) bathing, grooming and dressing;

(3) purchasing, cleaning, and care of clothes;

W.Va. at 69, 278 S.E.2d at 363. Once a determination of primary caretaker has been established, a presumption in favor of the primary caretaker attaches, and the primary caretaker is entitled to custody absent a showing that he or she is unfit. *See id.*, 167 W.Va. at 68, 278 S.E.2d at 362.

 The primary caretaker status of an individual is to be determined on the basis of that individual's duties and responsibilities "until the initiation of divorce proceedings." *Id.*, 167 W.Va. at 59, 278 S.E.2d at 357, Syl. Pt. 3, in part. In *Garska*, we explained the application of the primary caretaker presumption as follows:

> In a divorce proceeding where custody of a child of tender years is sought by both the mother and father, the court must determine in the first instance whether the primary caretaker is a fit parent, and where the primary caretaker achieves the minimum, objective standard of behavior which qualifies him or her as a fit parent, the trial court must award the child to the primary caretaker.

*Id.* at Syl. Pt. 6.

In making a determination of whether an individual is entitled to the primary caretaker presumption, the individual's adulterous conduct or illicit sexual activities are not to be considered unless such conduct had a deleterious effect upon the children. Syl. Pt. 4, *J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978), *superseded by statute as stated in David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989).

> 'Acts of sexual misconduct by a [primary caretaker], albeit wrongs against an innocent spouse, may not be considered as evidence going to the fitness of the [caretaker] for child custody unless [his or] her conduct is so aggravated, given contemporary moral standards, that reasonable men would find that [his or] her

immorality, *per se*, warranted a finding of unfitness because of the deleterious effect upon the child of being raised by a [primary caretaker] with such a defective character.'

Syl. Pt. 7, *David M.*, 182 W.Va. 58, 385 S.E.2d 912 (quoting Syl. Pt. 4, *J.B.*, 161 W.Va. at 332, 242 S.E.2d at 248, as modified by *Garska*, 167 W.Va. at 70, 278 S.E.2d at 363); *see accord Isaacs v. Isaacs*, 178 W.Va. 272, 274, 358 S.E.2d 833, 835 (1987); Syl. Pt. 4, *Bickler v. Bickler*, 176 W.Va. 407, 344 S.E.2d 630 (1986); Syl. Pt. 3, *Stacy v. Stacy*, 175 W.Va. 247, 332 S.E.2d 260 (1985). Consequently, in resolving a child custody issue, this Court will not concern itself with the adulterous conduct of a parent absent a deleterious effect upon the children. "[R]estrained normal sexual behavior does not make a parent unfit. The law does not attend to traditional concepts of immorality in the abstract, but only to whether the child is a party to, or is influenced by, such behavior." Neely, *The Primary Caretaker Parent Rule, Child Custody and the Dynamics of Greed*, 3 Yale L. & Pol'y Rev. 168, 181 (1984).

 The bulk of the evidence adduced at the hearings concerned the issue of the adulterous behavior of the appellant, rather than the more significant issue of which parent was the primary caretaker. The record is clearly devoid, however, of any evidence indicating that the appellant's sexual exploits had a deleterious effect upon the children. The evidence does reflect that the children accidently met Mr. M. on one occasion and further reflects that the children were aware that they had "two Mikes," one being Mr. M. and the other their babysitter Michelle, nicknamed Mike. However, realization of the existence of the individual with whom their mother was maintaining relations and an accidental

(4) medical care, including nursing and trips to physicians;
(5) arranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings;
(6) arranging alternative care, i.e. babysitting, day-care, etc.;
(7) putting child to bed at night, attending to child in the middle of night, waking child in the morning;

(8) disciplining, i.e. teaching general manners and toilet training;
(9) educating, i.e. religious, cultural, social, etc.; and,
(10) teaching elementary skills, i.e., reading, writing and arithmetic.'
167 W.Va. at 69–70, 278 S.E.2d at 363.

meeting without further interaction certainly does not constitute evidence of a "deleterious effect" upon the children. The children's babysitter did testify that the marital strife in general may have had an effect on the older boy whom the babysitter observed "staring off" into the distance. Again, however, this evidence is not sufficient to establish that the appellant's adulterous conduct had a deleterious effect upon the children.

■ Upon review of the evidence which did address the appropriate issue of primary caretaker, we find that the appellant performed the duties of primary caretaker and is entitled to the primary caretaker presumption. The appellant testified that she operates her own beauty shop in Barbour County, West Virginia. She explained that she works on Tuesday, Wednesday, Friday, and Saturday in an average week, but that her schedule is flexible according to the needs of the children. The record reflects that the appellee worked part-time for the first few years of the marriage, but has maintained a less stable employment history since that time. The appellee's present employment requires him to arise at approximately 4:00 a.m. to prepare for work. The appellee typically worked five to six days each week and arrived home between 5:30 and 6:30 p.m., arriving home earlier during the summer months. When the appellee and the appellant were both working, babysitters or the appellant's mother cared for the children. The appellant testified that she arranged for babysitters, bought groceries, and took the children to the beauty shop with her when a babysitter was not available. Bonnie S., a babysitter for the children for approximately two and one-half years, testified that she was never called to babysit the children on any of the appellant's days off. Furthermore, Ms. S. testified that although both parties were fit persons, the appellant prepared most of the meals, bathed and groomed the children, arranged for babysitting, potty-trained, and educated the children.

The appellee testified that he often watched the children until his wife returned home from work, but frequently took the children to the appellant's mother's home in the evening or on his days off from work. The appellee testified that he sometimes bathed the children, fed them their evening meals, and assisted in the children's medical care. There is also evidence that the appellee has contributed to disciplining and educating the children. The appellee also picked the children up from the babysitter and made certain that the children were given an evening meal, often at his sister's home, his mother's home, or the appellant's mother's home. The appellee, however, described his activity as "watching the kids till Tammy got home."

The record reflects that although the appellee began spending more time with the children after the divorce action was filed, the appellant was primarily responsible for the children prior to that time. The parties presented numerous witnesses, including prior babysitters, friends, co-workers, and relatives to address the issue of primary caretaker. The majority of such testimony indicates that the appellant performed the duties of primary caretaker, disciplined the children, dressed them, laundered their clothing, bathed them, prepared their meals, purchased food, cared for the children's medical needs, and arranged birthday parties and school functions.

Upon a thorough review of the record, it is apparent that the appellant performed the bulk of the duties of primary caretaker. Furthermore, although the circuit court explicitly stated that it did not base its decision on the adulterous conduct of the appellant, a review of the record indicates that the overwhelming thrust of the evidence related to such conduct. The issue of such conduct was repeatedly belabored in an apparent attempt to discredit the appellant as a parent. That fact, coupled with the family law master's finding relating marital misconduct to parental fitness (which was adopted by the circuit court) leads us to the conclusion that indeed the custody decision did hinge on the misconduct issue. The adulterous conduct of an individual, absent a deleterious effect upon the children, is neither germane to the determina-

**680**

tion of primary caretaker nor to the issue of fitness to receive custody of the children. We fail to perceive any evidence indicating that the adulterous conduct of the appellant had a deleterious effect on Jared L.W. or Drew T.W. and therefore refuse to permit such conduct to bear upon our decision. Upon review of the evidence, we conclude that the lower court erred by failing to award the primary caretaker presumption to the appellant.

 Accordingly, we reverse the decision of the Circuit Court of Barbour County and remand this case with directions that custody of the infant children be awarded to the appellant and with further directions that the appellee be awarded extensive and meaningful visitation rights. However, the lower court should endeavor to fashion a plan of transition of custody designed to minimize any unsettling effects on the children's lives. The record is devoid of any information on what daytime child care arrangements and visitation schedules have been in effect. The court should examine the caretaking arrangement the children have had during the parents' working hours, and if it is a good one wherein the children are happy and well taken care of, it should be continued if at all possible. As we recognized in *Honaker v. Burnside*, 182 W.Va. 448, 452, 388 S.E.2d 322, 326 (1989), stability in a child's life is a major concern. This continuity is especially important if a grandparent or other relative has been the caregiver. As we pointed out in *Honaker*, children have rights, too. 182 W.Va. at 452, 388 S.E.2d at 326. "Taking away continued contact with ... important figures in ... [a child's] life would be detrimental to her stability and well-being...." *Id.*

Reversed and remanded with directions.