419 S.E.2d 907

**Melinda Ann (Bradley) ORTNER, Plaintiff Below, Appellee,**

v.

**Amy PRITT, Defendant Below, Appellant.**

No. 20890.

Supreme Court of Appeals of West Virginia.

Submitted May 6, 1992.

Decided July 17, 1992.

Peter A. Hendricks, Madison, for appellant.

No appearance for appellee.

**PER CURIAM:**

This is an appeal by Amy Pritt from an order entered by the Circuit Court of Boone County on November 1, 1990, in a proceeding involving the custody of her infant grandson, John McKinley Pritt, II. The circuit court ordered that, after a transition period, the child should be removed from the actual physical custody of the appellant, and that custody be vested in the infant's mother, Melinda Ann (Bradley) Ortner. On appeal, the appellant argues that the trial court's conclusions were incorrect, and that the trial court erred in transferring custody of the child to Mrs. Ortner. Under the circumstances in this case, we find that it is in the best interests of the child that custody be vested in Amy Pritt.

We note at the outset that the record in this case is incomplete. A transcript of the evidence before the trial court was unable to be obtained despite a writ of mandamus issued by this court ordering transcription of the proceedings below. Furthermore, Mrs. Ortner has not participated in these appeal proceedings. The trial court did not enter a final order in this case for well over three years after this action was instituted. Time was further extended upon appeal in the unsuccessful effort to obtain the transcript. Despite the great length of time over which this case has been in litigation, we are limited in our review of the facts to three depositions, various psychological reports concerning John Pritt, II, home studies performed upon the parties at the request of the trial court, and the testimony before the trial court as recounted by the appellant's counsel.

John McKinley Pritt, II, was born on February 14, 1983 to John Pritt, Sr. and Melinda Ann (Bradley) Ortner. After the birth of their child, Mr. Pritt and Mrs. Ortner[1] and their child resided with the appellant, Amy Pritt, in Boone County, West Virginia. However, on October 5, 1983, Mr. Pritt died of a heart attack. Mrs. Ortner thereafter moved from the residence of Amy Pritt into a rented trailer of her own.

Mrs. Ortner married Michael Bradley on November 9, 1984. One child, Chrissy, was born of that marriage in February, 1985. Mrs. Ortner and Mr. Bradley apparently separated in May, 1987, and divorced sometime thereafter.

The evidence before this Court is unclear as to how much time John Pritt, II, spent with either Mrs. Ortner or Amy Pritt prior to the institution of these proceedings by Mrs. Ortner in August, 1987. What can be gleaned from the record is that John, II, spent a considerable amount of time under the care of his grandmother, Amy Pritt, and at one point spent several months under her care when his mother was out of state.[2]

On August 31, 1987, Mrs. Ortner petitioned the Circuit Court of Boone County for a writ of habeas corpus to issue against Kathy Pritt Clendenin, daughter of Amy Pritt, ordering Mrs. Clendenin to produce John, II, at a September 9, 1987 hearing. The writ was issued. At the September 9, 1987 hearing Amy Pritt was added as a respondent.[3] She and Mrs. Clendenin responded that John, II, had been in their continuous care since August 12, 1986 at the insistence of Mrs. Ortner. Nonetheless, the trial court issued a temporary order, entered December 15, 1987, vesting the custody of John, II, in Mrs. Ortner.

The trial court issued an "Order Upon Writ for Habeas Corpus" on April 5, 1988. Said order decreed that John, II, be removed from the custody of Mrs. Ortner and temporarily placed in the custody of Amy Pritt and Mrs. Clendenin. Mrs. Ortner was granted "reasonable visitation rights ... bearing in mind that said petitioner shall not remove or otherwise cause said child to be removed from the State of West Virginia while exercising her visitation rights."[4] The trial court's rationale for the temporary order was its finding that "[Mrs. Ortner's] situation and circumstances [are] so unstable as to find it in the child's best interests to be placed with [Amy Pritt and Mrs. Clendenin]." Apparently the trial court made this finding based upon a home study done of Mrs. Ortner's Boone County residence which questioned the stability of Mrs. Ortner's household.

The home study performed on Mrs. Ortner's home in Boone County noted that the home was a two-bedroom trailer that "looked clean and had a partially fenced yard." The report noted that John, II, and Chrissy, who were in Mrs. Ortner's custody at that time, "appeared clean, healthy and happy."

The home study performed on Amy Pritt's home stated that her residence was a "neat and well-maintained" three-bedroom ranch style home, with a yard and

---

1. Mr. Pritt and Mrs. Ortner did not marry.

2. The meager evidence before this Court suggests that John, II, spent anywhere from one-half of his life up to 95% with Amy Pritt. The trial court made no specific finding in this regard, stating only that both parties had exercised some physical custody and maintained varying degrees of control over John, II. The trial court found that neither the mother nor the grandmother was the "primary caretaker" of John, II.

3. Mrs. Clendenin was later dismissed as a respondent.

4. Counsel for appellant asserts that the visitation rights of Mrs. Ortner were "restricted or guarded" and that this is a reason for reversing the trial court. There is nothing in the trial court's order granting temporary custody in Amy Pritt that suggests the visitation rights of Mrs. Ortner were to be "restricted or guarded" in any way. Furthermore, the trial court specifically decreed that it "[made] no finding of fitness or unfitness of [Mrs. Ortner]" at that time.

swing set. The report opined that "[Amy Pritt] seems sensible and mature ... she seems emotionally and financially stable, and capable of providing a good home for a child."

The April 5, 1988 temporary order of the trial court also directed that John, II, undergo counseling services at Shawnee Hills clinic in Boone County and that a report be forthcoming concerning findings made by those counselors. There is no report from Shawnee Hills clinic in the record before this Court.[5] The record does reveal, however, that John, II, was admitted to Highland Hospital of Boone County in July, 1988, for a period of several weeks, and during that time came under the care of Dr. Stephen Kissinger, a psychiatrist, and William Hall, M.A., a psychologist.

In a September 1, 1988 deposition, Mr. Hall opined:

I don't believe that John will ever perceive his biological mother as a mom. I don't believe that he will ever perceive her as entirely nurturing, loving, and someone to be trusted to have his best interests at heart. I would hope that there—I think it is probably unrealistic to ever expect John and his mother to develop a so-called normal mother/son bond; I don't believe that's going to happen.

Mr. Hall further recommended that John, II, be placed in the custody of Amy Pritt and Mrs. Clendenin, based on his observation of an "obvious psychological bond" existing between those parties.

Also in a September 1, 1988 deposition, Dr. Kissinger noted that "John talked about being hurt by his mother. And when she would call the unit, we would see his behavior deteriorate, in terms of becoming more aggressive, louder." He further opined that:

In terms of placement as we speak, based on what we know now, it appears from our experience with John that he would feel more comfortable with Amy and Kathy rather than his mother. That's not to say that at some point in the future, given therapy or deal with the mother, with the mother and the son, that that might at some time be at least as good; that's not true at the present time.

At some point in late 1987 or early 1988, Mrs. Ortner left Boone County and returned to her native Alabama. In June, 1988, she married Mark Ortner. At the request of the trial court, the Madison County, Alabama, Department of Human Resources conducted a home study of Mrs. Ortner's new home. The report, dated August 16, 1988, stated that Mr. and Mrs. Ortner "seem willing and capable to assume responsibility for the physical or emotional needs of Mrs. Ortner's children ..." A home study update completed October 13, 1989 recommended that John, II, be placed with Mr. and Mrs. Ortner. The former home study noted that a February, 1988 visit to Mrs. Ortner's residence, when John, II, was in her custody, "determined that there were no problems with physical care and discipline that John was receiving while in his mother's care."

The record also reveals the deposition testimony of Cornelia Turnbow, a psychotherapist from Huntsville, Alabama. Mrs. Turnbow stated that she had seen Mrs. Ortner for 39 counseling sessions over the previous year. The counseling was initiated to help Mrs. Ortner deal with the stress of the litigation concerning the custody of John, II and Chrissy Bradley.[6] Mrs. Turnbow concluded from her observations of Mrs. Ortner, and Mrs. Ortner's

---

5. Pleadings before the trial court on behalf of Mrs. Ortner assert that "[John, II] did have an initial intake interview with Shawnee Hills on April 18, 1988, and the health professionals were skeptical of [John, II's] history as related by [Amy Pritt] and Mrs. Clendenin and found [John, II] to be 'remarkably intact.'"

6. At the time of Mrs. Turnbow's deposition, Mrs. Ortner had been granted custody of her daughter, Chrissy Bradley.

relationship with Chrissy Bradley and Nicole Ortner[7] that:

> From what I have observed and from what she has, you know, related to me, which is all I can base it on, I can see her as a very warm, loving mother who has a large amount of patience with these two young children and who's very concerned about their well-being, you know, and their care.

On November 1, 1990, the trial court entered its final order in this case. The trial court made, among others, the following findings of fact:

> Prior to this issue coming to Court, both parties had some physical custody of the infant child and maintained varying degrees of control over the infant child and his needs; therefore, the Court finds that neither party is the primary caretaker.
>
> [Mrs. Ortner] has not committed misconduct, neglect or immorality as to establish unfitness and has not abandoned, transferred, or otherwise surrendered custody of the infant child to [Amy Pritt].
>
> It is in the best interest of the infant child to be in the custody of his natural mother, [Mrs. Ortner].

The trial court ordered that custody be vested in Mrs. Ortner, following a transition period to allow John, II, to obtain counseling to prepare him for the change of custody. This appeal followed.

Importantly, it has been represented to this Court that John, II, is still in the custody of Amy Pritt. Mrs. Ortner has taken no action to physically take custody of John, II, nor has she participated in these appellate proceedings.[8] In fact, her trial counsel was forced to withdraw from this case without her consent when she moved from her former residence in Alabama and left no forwarding address. She has made no inquiry concerning the status of this case with her trial counsel, trial counsel's former law firm, or this Court.

■ In the syllabus of *State of FLA., DHRS v. Thornton,* 183 W.Va. 513, 396 S.E.2d 475 (1990), we held:

> 'If a child has resided with an individual other than a parent for a significant period of time such that the non-parent with whom the child resides serves as the child's psychological parent, ... the equitable rights of the child must be considered in connection with any decision that would alter the child's custody. To protect the equitable rights of a child in this situation, the child's environment should not be disturbed without a clear showing of significant benefit to him....' Syl.Pt. 4, in part, *In the Interest of Brandon L.E.* [183 W.Va. 113], 394 S.E.2d 515 (W.Va.1990).

■ The evidence in the record before this Court shows that John, II has resided with his grandmother for a significant period of time. The only psychiatric and psychological evidence of record shows that Amy Pritt is the child's "psychological parent." This evidence is uncontradicted. In this situation, then, to protect John, II's equitable rights, his "environment should not be disturbed without a clear showing of *significant benefit* to him." *Thornton, supra.* (emphasis added).

There is no evidence in the record showing that John, II, would acquire a "significant benefit" by a change of custody as awarded by the trial court. Nor did the trial court make such a finding. And although we are hampered upon appellate review by a lack of a transcript below, Mrs. Ortner has made no effort whatsoever to show this Court any evidence that a change

---

7. Nicole Ortner is Mr. Ortner's child from a previous relationship. She was living with Mr. and Mrs. Ortner at the time of Mrs. Turnbow's deposition.

8. We note for the record that Rule 10(e) of the *W.Va.R.App.P.,* applicable to the instant case, states:

> *(e) Failure to File Brief.* The failure to file a brief in accordance with this rule may result in the Supreme Court imposing the following sanctions: refusal to hear the case, denying oral argument to the derelict party, dismissal of the case from the docket, or such other sanctions as the Court may deem appropriate.

of custody would be of "significant benefit" to John, II. Without any such evidence, the change of custody ordered by the trial court must be reversed.[9]

Based upon the foregoing, the November 1, 1990 order of the Circuit Court of Boone County is reversed.

Reversed.

9. Nothing in this opinion should be construed as limiting the right of the infant child's natural mother to petition the trial court at some later date for a modification of this custody decree. As we stated in *Tucker v. Tucker,* 176 W.Va. 80, 82–83, 341 S.E.2d 700, 702 (1986):

In *Phillips v. Phillips,* 24 W.Va. 591 (1884), this Court recognized the right of a noncustodial parent to have a hearing on a petition to modify the child custody award made in a former divorce decree. We reaffirm that right and hold that under the due process clause, Article III, Section 10 of the West Virginia Constitution, a parent who files a petition for a change of child custody alleging sufficient grounds to warrant such change, *Acord v. Acord,* [164 W.Va. 562, 264 S.E.2d 848 (1980)] is entitled to a hearing on the merits of the petition.