438 S.E.2d 530

**Kenneth R. SIMMONS, Plaintiff Below, Appellee,**

v.

**Loretta L. COMER, Defendant Below, Appellant.**

**No. 21459.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 26, 1993.

Decided April 2, 1993.

Dissenting Opinion of Justice Neely Dec. 13, 1993.

Jerry D. Moore, Franklin, for appellee.

Marla Zelene Harman, Franklin, for appellant.

MILLER, Justice.

Loretta Comer appeals a May 28, 1992, order of the Circuit Court of Pendleton County that granted custody of her daughter, Nicole, to Kenneth Simmons, while allowing Ms. Comer visitation rights. Ms. Comer argues that the lower court erred in granting custody to Mr. Simmons, who is not the biological father of the child, absent a showing of parental unfitness on her part.

I.

The basic facts, while not in substantial dispute, do contain several gaps. For reasons that are not disclosed, Ms. Comer left her parents' home in Ohio as a teenager and moved to Pendleton County, West Virginia. While there, she attended high school and worked to support herself. In 1985, while still in high school, she gave birth to a daughter, Amanda. The paternity of Amanda has not been legally determined.

Ms. Comer graduated from Franklin High School in 1987 and continued to reside in Pendleton County. In 1988, Ms. Comer engaged in a sexual relationship with Mr. Simmons. Later that year, she returned, with her daughter Amanda, to her parents' home in Ohio. On March 11, 1989, she gave birth to Nicole in Ohio.

In June of 1989, Ms. Comer returned to West Virginia and informed Mr. Simmons of Nicole's birth and asserted that he was the father. Although the record is not developed in this regard, the parties did not marry. Mr. Simmons did, however, in August of 1989, move Ms. Comer, Amanda, and Nicole into his parents' home to live with him. In September of 1989, Ms. Comer found employment with Wampler Food Company, where Mr. Simmons and his mother and father worked. Ms. Comer had no automobile, and, as a consequence, rode to and from work with Mr. Simmons.

A babysitter was employed to care for Amanda and Nicole while the parties worked. Both Mr. Simmons and Ms. Comer shared parental responsibilities for Nicole. Mr. Simmons drove them to doctor appointments and shopping. He paid the babysitter and purchased formula, diapers, and clothing for Nicole. Some assistance was also given by Mr. Simmons' mother by way of cooking and washing.

In January of 1990, Ms. Comer and her two daughters moved out of the Simmons home and into a mobile home about a mile away. Ms. Comer continued to work and was taken to and from work by Mr. Simmons. The two children continued to stay during the day with a babysitter. However, the custody of Nicole was divided and she spent some evenings with the Simmons family and other evenings with Ms. Comer. The testimony diverges as to the degree of custody in the evening, with Ms. Comer claiming it was about evenly divided and Mr. Simmons stating that he had Nicole about 70 percent of the evenings.

Mr. Simmons continued to furnish transportation to doctor appointments and shopping because Ms. Comer had no vehicle. He also contributed substantially to Nicole's support. This arrangement apparently continued until December of 1990. At that point, Mr. Simmons, who had previously retained a lawyer, filed a suit to obtain permanent custody of Nicole. This action was taken because Mr. Simmons was concerned that Ms. Comer intended to move herself and her children back to her parents' home in Ohio. At the time, Mr. Simmons had physical custody of Nicole and refused to permit Ms. Comer to remove Nicole from his parents' home, but did permit her guarded visitation.

At a hearing held before the family law master in January, 1991, brief testimony was taken from Ms. Comer, Mr. Simmons, and Nicole's babysitter. It was at this hearing that Ms. Comer, for the first time, claimed that Mr. Simmons was not Nicole's biological father. At the conclusion of the hearing, the family law master decided that Mr. Simmons should have custody of Nicole during the week and Ms. Comer should have custody from Friday evening until Sunday evening. The family law master concluded that a blood test should be performed to determine whether Mr. Simmons was the biological father. These tests were performed in the summer of 1990, and the results thereof excluded Mr. Simmons from being the father of Nicole.

Thereafter, at a hearing held before the family law master on September 3, 1991, Ms. Comer testified that she now had a third child, Ashley. She further testified that she was planning to move to Ohio to live with her parents and to marry Ashley's father. The family law master temporarily transferred custody of Nicole to Ms. Comer, subject to visitation rights for Mr. Simmons, and pending an order from the circuit court. In his recommended order, the family law master directed that Ms. Comer not move Nicole out of West Virginia without the approval of the court. Despite this order, Ms. Comer, without notice to Mr. Simmons, moved Nicole to Ohio shortly after regaining custody. Mr. Simmons journeyed to Ohio to exercise his visitation rights, but was turned away by Ms. Comer's family.

Another hearing was held before the family law master on September 19, 1991, at which Ms. Comer was represented by her

attorney, but did not personally appear. The family law master ordered that Mr. Simmons be allowed to exercise his visitation rights with Nicole and set a hearing for October 3, 1991, before the Circuit Court of Pendleton County.

No new evidence was taken at the hearing before the circuit court on October 3, 1991. The circuit court ordered that the custody arrangements be altered so that Nicole would spend longer continuous periods of time with each parent and ordered that neither interfere with the other's visitation.[1]

An evidentiary hearing was held before the circuit court on May 4, 1992. Testimony of several witnesses was heard and reports of home studies from both the Ohio and West Virginia Departments of Health and Human Resources were admitted. The trial court found that both parents were fit parents and that both homes met the needs of the child. It also found that Mr. Simmons had relied upon Ms. Comer's assertion that he was the child's natural father and that, as a result, Mr. Simmons had formed a strong parent-child bond with the child. The circuit court noted that the law favors the rights of biological parents, but determined that the child should continue to have the advantage of a relationship with both Mr. Simmons and Ms. Comer. The circuit court concluded that Mr. Simmons had "parenting skills better than" Ms. Comer, and that Mr. Simmons should, therefore, have custody of the child. In its order of May 28, 1992, the circuit court granted permanent custody of Nicole to Mr. Simmons and gave Ms. Comer liberal visitation rights. Ms. Comer appeals.

## II.

■ In general, custody decisions in our State as between natural or adoptive parents, where both have been found to be fit,[2] are

based upon a determination of the child's primary caretaker. We introduced this concept in Syllabus Point 2 of *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981):

> "With reference to the custody of very young children, the law presumes that it is in the best interests of such children to be placed in the custody of their primary caretaker, if he or she is fit."

In *Garska*, we also set out a number of guidelines for determining the primary caretaker. These guidelines were later embodied in Syllabus Point 3 of *David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989):

> "The 'primary caretaker' is the parent who has taken primary responsibility for, *inter alia*, the performance of the following caring and nurturing duties of a parent: (1) preparing and planning of meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning, and care of clothes; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers after school, i.e., transporting to friends' houses or, for example, to girl or boy scout meetings; (6) arranging alternative care, i.e. babysitting, day-care, etc.; (7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning; (8) disciplining, i.e. teaching general manners and toilet training; (9) educating, i.e. religious, cultural, social, etc.; and, (10) teaching elementary skills, i.e., reading, writing and arithmetic."

■ The primary caretaker concept has been applied only in cases where the parties involved were the natural or adoptive parents of the child. *See, e.g., Garska v. McCoy, supra; David M. v. Margaret M., supra; Kenneth L.W. v. Tamyra S.W.*, 185 W.Va. 675, 408 S.E.2d 625 (1991); *Starkey v. Starkey*, 185 W.Va. 642, 408 S.E.2d 394 (1991);

---

1. The circuit court granted Ms. Comer twenty days of custody followed by ten days with Mr. Simmons.

2. In Syllabus Point 5 of *David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989), we set out factors that should be considered in determining when a parent is fit:

   "To be considered fit, the primary caretaker parent must: (1) feed and clothe the child

appropriately; (2) adequately supervise the child and protect him or her from harm; (3) provide habitable housing; (4) avoid extreme discipline, child abuse, and other similar vices; and (5) refrain from immoral behavior under circumstances that would affect the child. In this last regard, restrained normal sexual behavior does not make a parent unfit."

*Heck v. Heck*, 171 W.Va. 527, 301 S.E.2d 158 (1982), *cert. denied*, 464 U.S. 850, 104 S.Ct. 159, 78 L.Ed.2d 146 (1983). Indeed, with regard to a natural parent's right to custody of his or her child over third parties, we established this general rule found in Syllabus Point 1 of *In re Custody of Cottrill*, 176 W.Va. 529, 346 S.E.2d 47 (1986):

> " ' " 'A parent has the natural right to the custody of his or her infant child and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her child will be recognized and enforced by the courts.' Syl. pt. 2, *Hammack v. Wise*, [158] W.Va. [343], 211 S.E.2d 118 (1975); Syllabus, *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d 798 (1969); Syllabus, *Whiteman v. Robinson*, 145 W.Va. 685, 116 S.E.2d 691 (1960)." Syl. pt. 1, *Leach v. Bright*, [165] W.Va. [636], 270 S.E.2d 793 (1980).' Syllabus, *Ford v. Ford*, 172 W.Va. 25, 303 S.E.2d 253 (1983)."

**3.** *Ex Parte Presse* was decided under the Alabama Uniform Parentage Act, which creates five categories where a presumption of paternity exists. *See generally* H. Krause, *The Uniform Parentage Act*, 8 Fam.L.Q. 1 (1974). An alternative statutory approach is found in the Uniform Act on Paternity (1960).

**4.** California has two statutes, one of which created a presumption of paternity. The other statute related to visitation. In *Michael H.*, the United States Supreme Court found that the California ·provisions did not infringe upon due process rights of the putative father or upon the equal protection rights of the child. We need not deal with constitutional issues in this case.

**5.** We do not have a comprehensive statutory scheme covering the rights of a nonbiological father. Under W.Va.Code, 48A–6–1(a)(7) (1992), a civil action to establish paternity may be instituted by a "man purporting to be the father of a child born out-of-wedlock, when there has been no prior judicial determination of paternity." *See McGuire v. Farley*, 179 W.Va. 480, 370 S.E.2d 136 (1988). For an alternative method to establish paternity, see note 10, *infra*, for W.Va. Code, 48A–6–6 (1990).

**6.** The applicable Connecticut statute was set out in note 2, 208 Conn. at 407, 544 A.2d at 631:

## III.

We have not had occasion to examine a custody claim made by a nonbiological father. Other courts that have examined the rights of a nonbiological father to custody or visitation of a child have adopted several different theories. In some instances, courts have found that the matter is controlled by statute. *See, e.g., Ex Parte Presse*, 554 So.2d 406 (Ala.1989);[3] *Michael H. v. Gerald D.*, 191 Cal.App.3d 995, 236 Cal.Rptr. 810 (1987), *aff'd*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91, *reh. denied*, 492 U.S. 937, 110 S.Ct. 22, 106 L.Ed.2d 634 (1989);[4] Both of the foregoing cases dealt with situations where a custody attempt was made by a biological father against a man who had married the biological mother and the child was born during the marriage of the nonbiological father to the biological mother. Other jurisdictions have concluded that their statutes do not give a nonbiological father standing to assert custody,[5] but they do have standing to assert visitation rights under the statute. *See, e.g., Temple v. Myer*, 208 Conn. 404, 544 A.2d 629 (1988);[6] *In re Custody of Dombrowski*, 41 Wash.App. 753, 705 P.2d 1218

> " '[General Statutes] Sec. 46b–59. **COURT MAY GRANT RIGHT OF VISITATION TO ANY PERSON.** The superior court may grant the right of visitation with respect to any minor child or children to any person, upon an application of such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable, provided the grant of such visitation rights shall not be contingent upon any order of financial support by the court. In making, modifying or terminating such an order, the court shall be guided by the best interest of the child, giving consideration to the wishes of such child if he is of sufficient age and capable of forming an intelligent opinion. Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted. The grant of such visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon the custody of such child, the parental rights with respect to such child or the adoption of such child and any such court may include in its decree an order terminating such visitation rights.' "

(1985). The court in *Hughes v. Creighton,* 165 Ariz. 265, 798 P.2d 403 (App.1990), concluded that it lacked jurisdiction to consider a claim for visitation because there was no statutory authorization. The nonbiological father in *Hughes* claimed that he had acted as the psychological father to the child.

Independent of any statutory provision, courts have attempted to fashion theories enabling a nonbiological father to claim either custody or visitation rights to a child. At least one court has used the term "equitable parent" where the nonbiological father has developed close ties with the child and has assumed the duties of support and parenting. *See Atkinson v. Atkinson,* 160 Mich. App. 601, 408 N.W.2d 516 (1987). The court in *Atkinson* explained that the theory of "equitable parent" bore a relationship "akin to the doctrine of 'equitable adoption'[.]" 160 Mich.App. at 611, 408 N.W.2d at 520.[7]

There are also courts that rely on *de facto* or *in loco parentis* theories, basically using the same factual criteria as that used in an "equitable parent" analysis, to give standing to a nonbiological father who is married to the mother, who developed close ties with the child, and who has financially supported the child to the exclusion of the biological parent. *State in Interest of J.W.F.,* 799 P.2d 710 (Utah 1990) (stepfather); *Ettore I. v. Angela D.,* 127 App.Div.2d 6, 513 N.Y.S.2d 733 (1987) (psychological parent and estoppel).

The most common theory used in cases such as the one before us, however, is the doctrine of equitable estoppel. It is frequently used in situations where the natural mother asserts or misleads her husband to believe that he is the natural father; or, not being married, she informs the putative father that the child is his and he then marries the biological mother. In both instances, the husband assumes a caring, parental relationship with the child. Subsequently, when the marriage fails, the wife claims that he is not the biological father of the child. In these situations, courts will utilize the doctrine of equitable estoppel to give the father standing to obtain custody or visitation with the child. *See, e.g., Erwin v. Everard,* 561 So.2d 445 (Fla.App.1990); *Sharon G.G. v. Duane H.H.,* 95 A.D.2d 466, 467 N.Y.S.2d 941 (1983); *Boyles v. Boyles,* 95 A.D.2d 95, 466 N.Y.S.2d 762 (1983); *In re Marriage of Johns,* 42 Or.App. 39, 599 P.2d 1230 (1979); *In re Adoption of Young,* 469 Pa. 141, 364 A.2d 1307 (1976); *Gulla v. Fitzpatrick,* 408 Pa.Super. 269, 596 A.2d 851 (1991); *Pettinato v. Pettinato,* 582 A.2d 909 (R.I.1990); *In Re Paternity of D.L.H.,* 142 Wis.2d 606, 419 N.W.2d 283 (App.1987).[8]

Although equitable estoppel was used against the wife by the court in *Pettinato v. Pettinato, supra,* and by the Maryland Court of Special Appeals in *Monroe v. Monroe,* 88 Md.App. 132, 594 A.2d 577 (1991), *vacated,* 329 Md. 758, 621 A.2d 898 (1993), both jurisdictions had statutory provisions which legitimated the child, as shown in note 1 of *Monroe.*[9] In each case, the mother was unmar-

---

**7.** We recognized the doctrine of equitable adoption in Syllabus Point 1 of *First National Bank in Fairmont v. Phillips,* 176 W.Va. 395, 344 S.E.2d 201 (1985):

" 'The doctrine of equitable adoption is hereby incorporated into the law of West Virginia, but a litigant seeking to avail himself of the doctrine in a dispute among private parties concerning trusts or the descent of property at death must prove by clear, cogent, and convincing evidence that he has stood from an age of tender years in a position exactly equivalent to that of a formally adopted or natural child[.]' Syl. pt. 2 (in part), *Wheeling Dollar Savings & Trust Co. v. Singer,* 162 W.Va. 502, 250 S.E.2d 369 (1978)."

**8.** We utilized a concept similar to estoppel in *Michael K.T. v. Tina L.T.,* 182 W.Va. 399, 387 S.E.2d 866 (1989), where the putative father had married the biological mother and, thereafter, a child was born. Later, the husband filed for a divorce and claimed that the child was not his child. He sought to obtain blood tests to disprove his paternity. We held in Syllabus Point 3:

"A trial judge should refuse to admit blood test evidence which would disprove paternity when the individual attempting to disestablish paternity has held himself out to be the father of the child for a sufficient period of time such that disproof of paternity would result in undeniable harm to the child."

**9.** Note 1 of *Monroe v. Monroe,* 88 Md.App. at 139–40, 594 A.2d at 581, states:

"The Rhode Island Court [in *Pettinato v. Pettinato, supra* ] held that the foregoing satisfied the requirements of Rhode Island's presumption of paternity statute which contains similar provisions to the following Maryland statute which provides the methods by which a child may be legitimated:

ried when the child was born, but subsequently married the man who she had falsely informed was the father of the child. He accepted the role of a caring father and held himself out as the father. However, even under the statute, these factors would have given the nonbiological father standing to claim a parental right. The Maryland Court of Appeals in *Monroe v. Monroe*, 329 Md. 758, 621 A.2d 898 (1993), while recognizing the foregoing point, declined to apply an estoppel theory and reversed the Court of Special Appeals.

Our legitimation statute is not as broad as those enacted in Maryland and Rhode Island. Under W.Va.Code, 48A–6–1(a), a putative father may file a civil action to establish his paternity where the "child is born out-of-wedlock and there has been no prior judicial determination of paternity." Furthermore, W.Va.Code, 48A–6–6 (1990),[10] offers an alternative that we need not discuss because its provisions were not met in this case. If those provisions had been met, however, the biological mother would not have standing to assert that the father was not the biological father. Consideration of an estoppel issue would therefore be unnecessary.

■ In the foregoing cases where equitable estoppel was used against the mother, a common pattern may be observed. First, the mother represented to the putative fa-

ther that he is the biological father of the child. Second, the parties were married either before or after the child was born. Third, the putative father accepted and carried out a caring role as father of the child. These actions were deemed sufficient to meet their general rules for application of equitable estoppel, which are similar to our definition of equitable estoppel contained in Syllabus Point 3 of *Nisbet v. Watson*, 162 W.Va. 522, 251 S.E.2d 774 (1979):

> " 'It is essential to the application of the principles of equitable estoppel that the one claiming the benefit thereof establish that he relied, to his disadvantage or detriment, on the acts, conduct or representation of the one alleged to be estopped.' Point 2, Syllabus, *Helmick v. Broll*, 150 W.Va. 285, [144 S.E.2d 779] (1965)."

■ We find that the *Nisbet* estoppel rule would apply to the foregoing fact pattern where the biological mother misrepresented to the putative father that he is the biological father. In such a situation, the putative father has responded to his detriment by marrying the biological mother and assuming a caring role toward the child.

Moreover, when the putative father marries the biological mother, he assumes traditional family obligations. In this situation, it is obvious that simple morality and equity

§ 1–208. Illegitimate child.

"(a) *Child of his mother.*—A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his mother.

"(b) *Child of his father.*—A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his father only if the father

"(1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings; or

"(2) Has acknowledged himself, in writing, to be the father; or

"(3) Has openly and notoriously recognized the child to be his child, or

"(4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father.

Md. Est. & Trusts Code Ann. § 1–208 (1991)."

10. W.Va.Code, 48A–6–6, provides, in part:

"(a) The natural father of a child may file an application to establish paternity in circuit court when he acknowledges that the child is

his or when he has married the mother of the child after the child's birth and upon consent of the mother, or if she is deceased or incompetent, or has surrendered custody, upon the consent of the person or agency having custody of the child or of a court having jurisdiction over the child's custody. The application may be filed in the county where the natural father resides, the child resides, or the child was born. The circuit court, if satisfied that the applicant is the natural father and that establishment of the relationship is for the best interest of the child, shall enter the finding of fact and an order upon its docket, and thereafter the child is the child of the applicant, as though born to him in lawful wedlock.

"(b) A written acknowledgement by both the man and woman that the man is the father of the named child legally establishes the man as the father of the child for all purposes and child support can be established under the provisions of this chapter."

demand that the biological mother be estopped from denying his parenting role.

As earlier indicated, courts that use the equitable estoppel theory find that where it is applicable, the husband has standing to challenge the biological mother's right to sole custody of the child. Usually, these courts do not decide who should have actual custody, but remand the case to the trial court and observe that the best interests of the child should be given substantial consideration. *See, e.g., Monroe v. Monroe, supra; Boyles v. Boyles, supra; Gulla v. Fitzpatrick, supra; In re Marriage of D.L.J. and R.R.J.,* 162 Wis.2d 420, 469 N.W.2d 877 (1991).

However, as we have earlier noted, the use of the "best interests of the child" test to determine custody between biological or adoptive parents has been modified in this jurisdiction by *Garska v. McCoy, supra.* Therein, we created the primary caretaker presumption and established the following rules in Syllabus Points 2 through 6:

"2. With reference to the custody of very young children, the law presumes that it is in the best interests of such children to be placed in the custody of their primary caretaker, if he or she is fit.

"3. The primary caretaker is that natural or adoptive parent who, until the initiation of divorce proceedings, has been primarily responsible for the caring and nurturing of the child.

"4. In establishing which natural or adoptive parent is the primary caretaker, the trial court shall determine which parent has taken primary responsibility for the caring and nurturing duties of a parent.

"5. If the trial court is unable to establish that one parent has clearly taken primary responsibility for the caring and nurturing duties of a child neither party shall have the benefit of the primary caretaker presumption.

"6. In a divorce proceeding where custody of a child of tender years is sought by both the mother and father, the court must determine in the first instance whether the primary caretaker is a fit parent, and where the primary caretaker achieves the minimum, objective standard of behavior which qualifies him or her as a fit parent, the trial court must award the child to the primary caretaker."

In *Garska,* we explained in some detail the reasons we adopted the primary caretaker presumption. We pointed out that in past custody determinations where both parents were found to be fit, the vague best interests of the child standard created a parade of witnesses seeking to establish which parent's custody was in the best interest of the child. Because this ambiguous standard created substantial uncertainty as to the end result in custody actions, we stated in *Garska:*

"Uncertainty of outcome is very destructive of the position of the primary caretaker parent because he or she will be willing to sacrifice everything else in order to avoid the terrible prospect of losing the child in the unpredictable process of litigation.

"This phenomenon may be denominated the 'Solomon syndrome', that is that the parent who is most attached to the child will be most willing to accept an inferior bargain. . . .

"Therefore, in the interest of removing the issue of child custody from the type of acrimonious and counter-productive litigation which a procedure inviting exhaustive evidence will inevitably create, we hold today that there is a presumption in favor of the primary caretaker parent, if he or she meets the minimum, objective standard for being a fit parent as articulated in *J.B. v. A.B.,* [161 W.Va. 332, 242 S.E.2d 248 (1978) ], regardless of sex." 167 W.Va. at 67–68, 278 S.E.2d at 362. (Footnote omitted).[11]

## IV.

The question then arises as to the role the primary caretaker presumption plays when

---

**11.** Other jurisdictions have adopted the primary caretaker presumption. *See, e.g., Pikula v. Pikula,* 374 N.W.2d 705 (Minn.1985); *In re Maxwell,* 8 Ohio App.3d 302, 456 N.E.2d 1218, 8 OBR 409 (1982); *Matter of Marriage of Van Dyke,* 48 Or. App. 965, 618 P.2d 465 (1980); *Commonwealth ex rel. Jordan v. Jordan,* 302 Pa.Super. 421, 448 A.2d 1113 (1982). *Cf. Nickerson v. Nickerson,* 158 Vt. 85, 605 A.2d 1331 (1992) (primary caretaker presumption created by statute).

one of the parties is not the biological parent and seeks by way of estoppel to claim custody of a child with whom he has a caring relationship. As we have earlier pointed out, our traditional rule in regard to third parties is that the biological parent has a right to custody unless unfit or guilty of neglect or abandonment. *See* Syllabus Point 1, *In re Custody of Cottrill, supra.*

■ In the situation where a biological mother is married to the putative father or, although not married, advises him that he is the biological father and he marries her, he may have standing through the doctrine of equitable estoppel to assert a right to custody of the child. In order to maintain his claim of custody, the putative father must demonstrate that he has developed a caring relationship to the child such that he has become a functioning father. He will also have the benefit of the primary caretaker presumption if the facts so warrant.

■ Where such a pattern as described above does not exist, as in this case, because there has been no marriage, we conclude that the nonbiological father has no right to assert a claim for custody. This conclusion is not predicated solely on our desire to foster marriage as a means of creating a stable family for the child. Where a child is born or conceived during a marriage, we have traditionally held that there is a presumption of legitimacy, as explained in Syllabus Point 1 of *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 387 S.E.2d 866 (1989): "In West Virginia, the presumption of legitimacy that arises when a child is born or conceived during a marriage is rebuttable." [12]

We also are mindful of the legislative intent manifested by W.Va.Code, 48A–6–6(a), that is set out in note 10, *supra.* This subsection deals with the right of a natural father to establish his paternity. The statute's relevant language is: "The natural father of a child may file an application to establish paternity in circuit court when he acknowledges that the child is his or when he has married the mother of the child after the child's birth and *upon consent of the mother* [.]" (Emphasis added). It is clear under the foregoing language that where the natural father seeks to establish paternity, the consent of the natural mother is needed.[13] Because consent of the mother is required by the statute as to a natural father, we decline to grant a nonbiological father who is not married to the natural mother standing to seek custody by way of an estoppel theory when the mother does not consent.

■ Besides these basic precepts, we address the type of caring relationship that a nonbiological father must show to support a father-child relationship. A caring father-child relationship means not only providing financial support of the child, but also emotional and psychological support. The relationship must have begun with the consent of the biological mother. It must not have been temporary and there must have been sufficient time for the nonbiological father to become the "functioning father."[14] This time factor assists a court's determination as to the extent of the child's bond with the functioning father. *See, e.g., Halpern v. Halpern*, 133 Cal.App.3d 297, 184 Cal.Rptr. 740 (1982) (eleven-month-old baby insufficient); *Lloyd v. Lloyd*, 92 Ill.App.3d 124, 47 Ill.Dec.

---

**12.** In *Michael K.T.*, 182 W.Va. at 402, 387 S.E.2d at 868, we stated: "This presumption, which has been referred to as one of the strongest at law, had only two common law defenses: nonaccess and impotence." (Citation omitted).

**13.** This section does not foreclose the natural father from establishing paternity under W.Va. Code, 48A–6–1(a)(7).

**14.** The term "functioning father" and its rationale is discussed at some length by J.H. Anderson, *The Functioning Father: A Unified Approach to Paternity Determinations*, 30 J.Fam.L. 847, 865–67 (1992):

"The functioning father is a man who initiates positive, consensual interactions with a child

on a regular basis and provides for the child's care and support in proportion to his ability to do so. This definition includes a psychological component that requires an actual relationship but retains a financial element as well, thus encompassing the same variables often used in the termination of parental rights. The definition adds to those variables the need for consent in order to ensure that the existing legal parent has cooperated with or encouraged a man to assume a parenting role and that the relationship did not arise through some illegal activity, paid caretaking or casual liaison." (Emphasis in original; footnotes omitted).

792, 415 N.E.2d 1105 (1980) (seven-year-old child sufficient).

We believe the principle of a functioning father is consistent with our previous cases and, particularly, *In Interest of Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990), where we used the term "psychological parent." [15] However, as we set out in Syllabus Point 4 of *Brandon L.E.*, there is a limit as to when a psychological parent may intervene and claim a higher priority over a biological parent who has been found to be fit and who has not abandoned the child:

> "If a child has resided with an individual other than a parent for a significant period of time such that the non-parent with whom the child resides serves as the child's psychological parent, during a period *when the natural parent had the right to maintain continuing substantial contact with the child and failed to do so,* the equitable rights of the child must be considered in connection with any decision that would alter the child's custody. To protect the equitable rights of a child in this situation, the child's environment should not be disturbed without a clear showing of significant benefit to him, notwithstanding the parent's assertion of a legal right to the child." (Emphasis added).[16]

Finally, we observe that a putative father is not without some means of having a determination made as to whether he is the biological father. He is entitled to rights accorded by W.Va.Code, 48A–6–1(a)(7), and W.Va. Code, 48A–6–6(a).[17] Under these sections, a putative father is able to obtain a prompt determination of paternity rather than having to rely on the representations of the biological mother.

Under W.Va.Code, 48A–6–6(b), paternity may also be established by a "written acknowledgment by both the man and woman that the man is the father of the named child[.]" [18] Mr. Simmons did not attempt to utilize this provision by obtaining the consent of Ms. Comer. The record in this case reveals that Mr. Simmons had contacted a lawyer in May of 1990 about obtaining custody of the child. This was some eight months before the situation deteriorated to the point where he filed the custody suit in December of 1990.

Another aid to a putative father is found in *Brandon L.E., supra,* which dealt with the custody rights of a biological mother. If she is found to be unfit or to have abandoned visitation with the child over a sufficient period of time, she may lose her preferred status insofar as the psychological parent is concerned. When this occurs, custody should not be changed without considering the best interests of the child. However, in this case, Ms. Comer was not found to be unfit nor had she abandoned the child.

---

**15.** The term "psychological parent" is defined in the Model Child Placement Statute proposed by Joseph Goldstein, et al., in *Beyond the Best Interests of the Child* at 98 (1979):

> "A psychological parent is one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for a parent, as well as the child's physical needs. The psychological parent may be a biological, ... adoptive, foster, or common-law ... parent, or any other person. There is no presumption in favor of any of these after the initial assignment at birth[.]"

**16.** In a *per curiam* opinion, *State of Florida D.H.R.S. v. Thornton*, 183 W.Va. 513, 396 S.E.2d 475 (1990), we cited Syllabus Point 4 of *Brandon L.E.*, but omitted the phrase "during a period when the natural parent had the right to maintain continuing substantial contact with the child and failed to do so[.]" However, in *Thornton*, the natural mother was in prison and the father's whereabouts were unknown. The custody action was between the Florida Department of Health and Rehabilitative Services and the Thorntons who had originally been granted custody. The Syllabus in *Thornton* also was used in *Ortner v. Pritt*, 187 W.Va. 494, 419 S.E.2d 907 (1992), another *per curiam* opinion. In that case, it was clear that the mother had abandoned the child with her mother-in-law and the natural father was not involved. The original Syllabus Point 4 of *Brandon L.E.* would have controlled that case.

**17.** The texts of these sections are set out in notes 5 and 10, *supra.*

**18.** W.Va.Code, 48A–6–6(b), provides: "A written acknowledgment by both the man and woman that the man is the father of the named child legally establishes the man as the father of the child for all purposes and child support can be established under the provisions of this chapter."

Finally, we again emphasize that both the family law master and the court below found Ms. Comer to be a fit mother.[19] This finding was based, in part, on the report of the Ohio Department of Human Services on Ms. Comer's family home in Rittman, Ohio.[20] She had moved there after the family law master gave her custody in September of 1991. The report found a happy and well-integrated family.[21] The finding of fitness was made by the lower court in the face of his knowledge that she had two other children that had been born out of wedlock.

■ We recognize that the foregoing considerations were not available to the trial court. We emphasize, however, that we do not believe Mr. Simmons stands on the same footing as Ms. Comer, the biological mother. When the court below found that both were fit parents, Ms. Comer's custody rights to her biological child were denied solely on the basis that Mr. Simmons had been the primary caretaker for the rather short period of time involved. However, we decline to extend the primary caretaker rule to a nonbiological father where the biological mother is a fit person and he has not married her. This ruling would not foreclose Mr. Simmons from having visitation with the child based on the finding that he has acted as a functioning father.

For the foregoing reasons, the judgment of the Circuit Court of Pendleton County is reversed and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

NEELY, Justice, dissenting:

[Filed Dec. 13, 1993.]

As the majority points out, the traditional rule in West Virginia is that a biological parent has a right to custody as against a third party unless unfit or guilty of neglect or abandonment. Syllabus point 1, *In Re Custody of Cottrill*, 176 W.Va. 529, 346 S.E.2d 47 (1986). Where, however, a biological mother represents to the putative father that he is the biological father of the child and the putative father responds to his detriment by marrying the biological mother and assuming a caring role toward the child, the putative father may have standing to assert a right to custody of the child; he may also have the benefit of the primary caretaker presumption if the facts so warrant. *See* majority opinion at 539.

In Syllabus point 3 of *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981), we held that if the trial court is unable to establish that one parent has clearly taken primary responsibility for the caring and nurturing duties, neither party shall have the benefit of the primary caretaker presumption. In other words, in the absence of a definite determination of a primary caretaker, the analysis shifts to an ascertainment of the best interests of the child and the court must proceed to inquire further into relative degrees of parental competence. As the trial court order stated: "although the law favors the rights of the biological parent, the same is not so strong as to supersede the rights of the child."

In concluding that this custody case must be resolved on the basis of the best interests of the child, I reject the majority's contention that the rule favoring a mother in a custody dispute with a nonbiological father to whom she is not married is a device to "foster marriage as a means of creating a stable family for the child" and to encourage the child's natural father to legitimize the child. Rather the rule fosters both the parent's rights and the well-being of the child by

---

**19.** For the standards used to determine whether a parent is fit, see note 2, *supra*.

**20.** The report indicated that in 1989, Ms. Comer's mother had married a retired Navy veteran who receives a disability pension of $39,500 a year. He and Ms. Comer's mother also work and have an additional combined income of $1,220 a month. They live in a three-bedroom home with two baths. They are members of the Brethren Baptist Church.

**21.** The conclusion of the Ohio social worker was: "I find a clean safe home environment with no abuse, neglect or behaviors that would not allow the child to grow up in a normal atmosphere. This home has a lot of love in it and my recommendation is to allow the child to stay with her mother and that the mother be granted full custody."

recognizing that they ordinarily converge. Conversely, where extraordinary circumstances exist, other jurisdictions have recognized that those interests may not necessarily converge, and further inquiry into the child's best interests is then required before a custody dispute between a parent and nonparent may be resolved. *See e.g., Matter of Bennett v. Jeffreys*, 40 N.Y.2d 543, 387 N.Y.S.2d 821, 356 N.E.2d 277 (1976). As the court in *Bennett* said,

> [I]ntervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, *or other equivalent but rare extraordinary circumstances which could drastically affect the welfare of the child.* It is only on such a premise that the courts may then proceed to inquire into the best interests of the child and to order a custodial disposition on that ground.

40 N.Y.2d 543, 549, 387 N.Y.S.2d 821, 356 N.E.2d 277, *supra.* [Emphasis added].

The majority properly found that the trial court was correct in concluding that Ms. Comer had not abandoned the child and that she was not unfit; but, abandonment, neglect and unfitness are not the exclusive circumstances that can trigger an inquiry into the child's best interests. In this case, in the first year and one half of the child's life, Ms. Comer's conduct had the effect of authorizing and encouraging the development of a father-daughter relationship between Mr. Simmons and the child. During that time, Mr. Simmons, as Ms. Comer admits, had in all respects acted as the father of the child. As the trial court recognized, termination of that relationship would likely have a traumatic effect on the child. Accordingly, we believe that Ms. Comer, through her involvement in the creation and development of the father-daughter relationship between Mr. Simmons and the child, has put the child in a situation where her welfare will be affected drastically, and, thus, an extraordinary circumstance exists requiring inquiry into the child's best interests.

The best interests issue is separate and distinct from the extraordinary circumstances issue and must be decided on the basis of evidence relevant to whether the child's best interests will be served by granting custody to Ms. Comer or to Mr. Simmons. Under the "individualized" approach to the 'best interests of the child' standard, custody, when contested, goes to the parent who the court believes will do a better job of child rearing. *David M. v. Margaret M.*, 182 W.Va. 57, 63, 385 S.E.2d 912, 918–19 (1989).

In this case, the circuit court determined that the best interests of the child would be served by awarding custody to Mr. Simmons. The child's babysitter, Karen Casto, testified that when Mr. Simmons brought the child to her, the child would be dressed with diapers changed from the night before; she would have clean bottles and if she were on medication, Mr. Simmons would have given her the proper dosage before dropping her off with Ms. Casto. When Ms. Comer brought the child to Ms. Casto, in contrast, the baby frequently was in wet diapers; her diaper bag contained sour bottles of milk from the night before and she would forget to bring the child's medication. Indeed, on the limited number of nights when Loretta Comer kept the child when she had moved from the Simmons home, Mr. Simmons took the child to his home after work, fed her, bathed her, got her ready for bed and then took her to Ms. Comer's mobile home to spend the night.

At the same time, Ms. Comer, when asked with whom she had lived after she left the Simmons residence, was unable to recall the names of the men who had resided with her. When asked the number of men with whom she had lived since moving out of the Simmons' home, she stated: "I can't say. I mean ... I don't keep a log." In August 1991, she gave birth to her third illegitimate child. The evidence before us establishes that Mr. Simmons would provide the child a more stable and emotionally safer family environment and emphatically confirms the trial court's finding that Mr. Simmons possesses parenting skills better than those of the child's mother.

Furthermore, for public policy reasons, Ms. Comer, having held her child out as the

legitimate daughter of Mr. Simmons for a substantial period, should be precluded from thereafter bastardizing the child for the sole purpose of furthering her own self-interest in obtaining exclusive custody of the child. If indeed the child is born during coverture, it is an exercise in extraordinary irony to say that while the father cannot bastardize the child, the mother can. The law must, at the very least, give an appearance of neutrality.

For the foregoing reasons, I would affirm the trial court's judgment, and respectfully dissent. I am authorized to say that Justice Brotherton joins in this dissent.